Rebecca Noblin (Alaska Bar No. 0611080)
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
F: 907.277.1390
E: rnoblin@earthjustice.org
egrafe@earthjustice.org

*Attorneys for Plaintiffs Natural Resources Defense Council et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

NATURAL RESOURCES DEFENSE COUNCIL, CENTER FOR BIOLOGICAL DIVERSITY, GREENPEACE, INC., and FRIENDS OF THE EARTH,

*Plaintiffs,*

v.

RYAN ZINKE, in his official capacity as Secretary of the Interior; KAREN MOURITSEN, in her official capacity as Acting Alaska State Director of the Bureau of Land Management; and BUREAU OF LAND MANAGEMENT,

*Defendants.*

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(5 U.S.C. §§ 701-706; 42 U.S.C. § 4332)

## SUMMARY

1. This action arises from the failure of the Bureau of Land Management (BLM) to fulfill its obligations under the National Environmental Policy Act (NEPA) when it held oil and gas lease sales in the National Petroleum Reserve-Alaska (NPR-A or Reserve) in 2016 and 2017.

2. The Western Arctic, managed by BLM as the 23-million-acre Reserve, is recognized as a globally important ecological resource, home to bears, muskoxen, caribou, and millions of migratory birds. The lakes and lagoons of the Reserve, including Teshekpuk Lake, are the birthplace of millions of birds that fly to all 50 states and five continents. The Reserve provides calving, insect relief, and migration areas for two of Alaska's largest caribou herds—the Western Arctic and Teshekpuk caribou herds—which provide vital subsistence resources for more than 40 communities in northern and western Alaska. Polar bears, spectacled eiders, and Steller's eiders—all listed under the Endangered Species Act—call the Reserve home. Coastal areas of the Reserve provide designated critical habitat for polar bears, as well as important habitat for other marine mammals, including Pacific walruses and ice seals. Like the rest of the Arctic, the Reserve is warming rapidly, damaging its fragile ecosystems.

3. In 2016 and 2017, BLM held oil and gas lease sales in the Reserve pursuant to the Integrated Activity Plan and Environmental Impact Statement (Plan EIS) the agency adopted in 2013. While the Plan EIS provides a planning framework for the oil and gas leasing program in the NPR-A, BLM reserves until the lease sale phase decisions about the size and location of leases. Notwithstanding the critical decisions BLM faced when it decided which areas—if any—to make available for leasing in 2016 and 2017, BLM performed no new or additional NEPA analysis in conjunction with the lease sales. Instead, the agency purported to support its leasing decisions with documents called Determinations of NEPA Adequacy that relied entirely on the

Plan EIS to fulfill its NEPA obligations and determined that no additional analysis of alternatives or impacts was necessary at this next lease sale stage. In forgoing NEPA analysis at the lease sale stage in 2016 and 2017, BLM acted arbitrarily and capriciously and not in accordance with law and violated NEPA in at least two key respects: (1) it failed to take a hard look at the effects of the lease sales on greenhouse gas emissions and climate change; and (2) it failed to develop and compare a reasonable range of lease sale alternatives.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202. Judicial review is available under the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Venue is appropriate under 28 U.S.C. § 1391(e).

## PLAINTIFFS

5. Plaintiff Natural Resources Defense Council (NRDC) is a non-profit environmental advocacy organization with more than two million members and online activists. It has a longstanding and active involvement in the protection of the natural values of the Arctic, including the wildlife, wilderness, and other values of the Reserve, from the adverse effects of oil and gas exploration and development. With its nationwide membership and a staff of lawyers, scientists, communications specialists, and other environmental professionals, NRDC gathers, analyzes, and uses information about federal government proposals to shape its advocacy and inform its members on a diverse range of land and wildlife management and resource development issues, including those associated with climate change.

6. Plaintiff Center for Biological Diversity (the Center) is a national non-profit organization. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has more than 1.6 million members and online activists. The Center is actively involved in species and habitat protection issues throughout the United States. As part of these efforts, the Center works to protect Arctic wildlife that lives in and near the Reserve from the numerous harms inherent in oil and gas exploration and development.

7. Plaintiff Greenpeace, Inc., is a non-profit corporation organized under the laws of the State of California, with its principal place of business in Washington, D.C. Its mission is to promote the protection and preservation of the environment. Greenpeace is an independent campaigning organization that uses peaceful, creative action to expose global environmental problems and to force solutions that are essential for a green and peaceful future. Greenpeace has over 840,000 active supporters in the United States. For more than a decade, Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to pressure for serious cuts in greenhouse gas emissions through local, national, and global action. In the United States, Greenpeace has run campaigns aimed at stopping global warming by phasing out fossil fuel use and promoting renewable energy systems. As a part of these efforts, Greenpeace has actively worked to protect the Arctic from the harmful effects of oil and gas activities.

8. Plaintiff Friends of the Earth is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation existing under the laws of the District of Columbia. Friends of the Earth is a membership organization consisting of more than 100,000 members and almost 1.5 million activists nationwide, including more than 200 members who live in Alaska. Friends of the Earth

is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide. Friends of the Earth's mission is to protect our natural environment, including air, water, and land, to create a more healthy and just world. Friends of the Earth utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals. Friends of the Earth is concerned about the potential adverse impacts that fossil fuel exploration and development activities in Alaska's Arctic, including the Reserve, have on the climate and people, fish, birds, and other species that depend on this region. Therefore, on behalf of its members and activists, Friends of the Earth actively engages in advocacy to influence U.S. energy and environmental policies affecting Alaska's Arctic.

9. Members of plaintiff groups use and enjoy—and intend to continue to use and enjoy—the Reserve for various purposes, including recreation, wildlife viewing, education, research, photography, and/or aesthetic and spiritual enjoyment. Members of plaintiff groups also enjoy or otherwise use migratory wildlife from the Reserve. The 2016 and 2017 lease sales will directly and irreparably injure these interests.

10. The defendants' unlawful actions adversely affect plaintiffs' organizational interests in their members' use and enjoyment of the public lands in and resources of the Reserve. The 2016 and 2017 lease sales will directly and irreparably injure these interests.

11. Each of the plaintiff groups monitors the use of public lands in the Reserve and compliance with the law respecting these lands, educates its members and the public concerning the management of these lands, and advocates policies and practices that protect the natural values and sustainable resources of these lands. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands. The interests and organizational purposes of the

plaintiffs will be directly and irreparably injured by defendants' violations of law as described in this complaint.

## DEFENDANTS

12. Defendant Ryan Zinke is sued in his official capacity as Secretary of the Interior.

13. Defendant Karen Mouritsen is sued in her official capacity as Acting Alaska State Director of the Bureau of Land Management.

14. Defendant BLM is an agency of the United States Department of the Interior entrusted with the conservation and management of resources within the Reserve.

## LEGAL BACKGROUND

### I. NATIONAL ENVIRONMENTAL POLICY ACT

15. NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1(a). NEPA achieves its purpose through "action forcing procedures . . . requir[ing] that agencies take a *hard look* at environmental consequences." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added).

16. "Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.

17. To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement, known as an Environmental Impact Statement (EIS), must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, indirect, and cumulative environmental impacts, and

include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14 and 1502.16.

18. Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

19. These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. § 1508.8. BLM's analysis must do more than merely identify effects; it must also "evaluate the severity" of those effects. *Methow Valley Citizens Council*, 490 U.S. at 352; 40 C.F.R. §§ 1502.16(a)-(b) (recognizing that agency must explain the "significance" of effects).

20. An agency may also prepare an environmental assessment (EA) to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

21. NEPA allows an agency to "tier" an environmental analysis for a project to a broader EIS for a program or plan under which the subsequent project is carried out. 40 C.F.R. § 1508.28. When an agency tiers an analysis for a subsequent action or project to a broader EIS, "the subsequent statement or environmental assessment need only summarize the issues

discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." *Id.* § 1502.20.

22. The Department of the Interior's NEPA regulations for using tiered documents specify that EAs for subsequent projects "can be tiered to a programmatic or other broader-scope [EIS]." 43 C.F.R. § 46.140(c). As a general rule, an EA that tiers to another NEPA document "must include a finding that the conditions and environmental effects described in the broader NEPA document are still valid or address any exceptions." *Id.* § 46.140. If the programmatic EIS analyzes the impacts of the subsequent action, the agency is not required to perform additional analysis of impacts. *Id.* § 46.140(a). However, if the impacts analysis in the programmatic EIS "is not sufficiently comprehensive or adequate to support further decisions," the agency's EA must explain this and provide additional analysis. *Id.* § 46.140(b).

23. An agency must supplement an EIS when "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

## FACTUAL BACKGROUND

### I. CLIMATE CHANGE AND THE ARCTIC

24. Development in Alaska happens against the backdrop of a dramatically changing climate. Climate change is affecting the Reserve, and oil and gas drilling in the Reserve will, in turn, affect the climate.

25. Alaska has warmed more than twice as rapidly as the rest of the United States over the past 60 years, and the Arctic is expected to warm by an additional 10°F to 12°F. This rapid warming presents myriad disruptions to Arctic ecosystems, including in the Reserve. For example, permafrost plays an essential role in the Reserve by making the ground watertight and

maintaining the vast network of wetlands and lakes across the tundra that provide habitat for animals and plants. As permafrost thaws, it not only interferes with important habitat, but it also releases carbon dioxide and the powerful greenhouse gas methane into the atmosphere. This contributes to further warming in a reinforcing feedback loop. The loss of sea ice harms polar bears, walruses, and ice seals and contributes to coastal erosion that destroys polar bear denning habitat.

26. There is a broad, international scientific consensus that in order to avoid the worst impacts of climate change, the world must aggressively reduce greenhouse gas emissions. There is a finite amount of carbon dioxide that can be released into the atmosphere before the earth's temperature exceeds the globally recognized limit to which the nations of the world have agreed to avoid the worst effects of climate change; this is the earth's carbon budget. Globally, proven fossil fuel reserves—if extracted and burned—would release enough carbon dioxide to exceed this limit several times over. Consequently, the vast majority of fossil fuels must remain in the ground. A 2015 study concluded that to stay within the limit to avoid the worst effects of climate change, all Arctic fossil fuels should be classified as unburnable.

27. The oil market is a competitive global market, such that a decrease in supply would increase prices and, in turn, reduce consumption. If Arctic oil were not developed, only a fraction of the withheld oil would be replaced by other supplies.

28. The federal government has developed tools that agencies can use to determine the costs of greenhouse gas emissions in order to allow agencies such as BLM to incorporate the social benefits of reducing greenhouse gases into their decisionmaking processes. BLM has the information it needs to estimate possible greenhouse gas emissions from burning the fossil fuels that will be produced from the leases, as well as their costs. Indeed, as part of its development

scenario in 2012, BLM projected the amounts of economically recoverable undiscovered oil and gas in several economic zones within the NPR-A, based on estimates provided by the U.S. Geological Survey. Further exploration and development in the Reserve since 2012 adds multiple additional data points and gives BLM a stronger basis for estimating possible emissions that may result from the 2016 and 2017 lease sales.

## II. THE NATURAL VALUES OF THE RESERVE AND BLM'S OBLIGATION TO PROTECT THEM

29. In 1923, President Warren G. Harding set aside 23.7 million acres in northern Alaska as the Naval Petroleum Reserve Numbered 4, to be administered by the Navy as an assured future oil supply for defense purposes.

30. In 1976, President Gerald Ford signed the Naval Petroleum Reserves Production Act (NPRPA). Pub. L. No. 94-258, 90 Stat. 303 (1976). Among other things, the NPRPA transferred jurisdiction over the Naval Petroleum Reserve Numbered 4 from the Secretary of the Navy to the Secretary of the Interior and renamed it the National Petroleum Reserve-Alaska. In making the transfer, Congress expressly recognized that the protection of the unique natural, fish and wildlife, scenic, and historical values of the NPR-A would better be evaluated and managed under the authority of the Secretary of the Interior.

31. The NPRPA requires that any oil exploration activities conducted within areas designated by the Secretary of the Interior as containing "any significant subsistence, recreational, fish and wildlife, or historical or scenic value" be conducted in a manner that assures "maximum protection" of these surface values. *Id.* § 104(b), 90 Stat. at 304 (codified at 42 U.S.C. § 6504(a)).

32. In 1977, the Secretary of the Interior adopted regulations for management and protection of the NPR-A. 42 Fed. Reg. 28,720, 28,720 (June 3, 1977). The regulations indicate that surface values of the NPR-A may be protected by limiting, restricting, or prohibiting the use of and access to lands within the NPR-A, including "special areas." 43 C.F.R. § 2361.1(e)(1) (1997). In 1977, the Secretary of the Interior designated Teshekpuk Lake, the Colville River, and the Utukok River Uplands as Special Areas within the NPR-A. 42 Fed. Reg. 28,723, 28,723 (June 3, 1977).

33. The regulations also require BLM to "take such action . . . necessary to mitigate or avoid unnecessary surface damage and to minimize ecological disturbance throughout the reserve to the extent consistent with the requirements of the Act for the exploration of the reserve." 43 C.F.R. § 2361.1(a). "[W]ater, air, vegetation, and mineral values are components of the environment and must be protected and managed." 42 Fed. Reg. at 28,721.

34. In passing the NPRPA, Congress recognized that "[t]he northeastern coastal plain area [of the Reserve] is considered to be the best waterfowl nesting area on the North Slope" of Alaska. H.R. Rep. No. 94-81, Part I, at 8 (1975). For example, the Teshekpuk Lake watershed provides nesting habitat for many migratory waterfowl species, including northern pintails, long-tailed ducks, king eiders, Pacific brant, greater white-fronted geese, tundra swans, and three species of loons—Pacific, red-throated, and yellow-billed. The Teshekpuk Lake Special Area provides essential molting habitat for significant populations of migratory Pacific brant, greater white-fronted geese, and Canada geese. Spectacled and Steller's eiders, both listed as threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*., have relatively high nesting densities in areas around Teshekpuk Lake.

35. The Teshekpuk Lake area also encompasses major calving grounds for the 40,000 caribou of the Teshekpuk caribou herd. The population has declined from a high of nearly 69,000 in 2008. This caribou herd is an important food resource for local Alaska Native families.

36. The Colville River is the largest of Alaska's rivers that flow to the Arctic Ocean. The river and its tributaries provide important habitat for moose, brown bears, wolves, wolverines, and at least twenty species of anadromous and freshwater fish. It is a vital source of subsistence resources for area residents and is a spectacularly scenic area with substantial recreation values and potential for remote wilderness experiences. The Colville River is known for high concentrations of song birds and birds of prey, including Arctic peregrine falcons, gyrfalcons, and rough-legged hawks. It is recognized as one of the most significant regional habitats for raptors in North America.

## III. THE INTEGRATED ACTIVITY PLAN AND BLM'S MANAGEMENT OF THE RESERVE

37. BLM manages oil and gas activities in the Reserve pursuant to a multi-step process. It first promulgates "activity plans," which are programmatic management plans that zone areas of the Reserve for various purposes and impose limits on the manner in which oil and gas activities may take place in areas in which oil and gas leasing is permitted. It next holds lease sales in portions of areas that the activity plans have designated as open for leasing. For areas where leases are sold, BLM then reviews exploration plans submitted by lessees, and, if oil or gas are discovered on the leases, it reviews development plans for developing and producing these fossil fuels. Each of these steps constitutes a distinct agency decision.

38. In 2013, the Department of the Interior issued its first-ever comprehensive management plan covering the entire Reserve. This Integrated Activity Plan (Plan) designated approximately 52 percent (11.8 million acres) of the Reserve as available for oil and gas leasing and prohibited oil and gas leasing and development on approximately 11 million acres. It expanded existing Special Areas and added the Peard Bay Special Area. The Plan's leasing prohibitions cover most of the lands within the five designated Special Areas but leave open some tracts, including in the Colville River Special Area and the Teshekpuk Lake Special Area.

39. The management plan was developed through an EIS process. The Plan EIS analyzed five management alternatives. Alternative A was the no-action alternative, which would have continued separate management of the Northwest and Northeast NPR-A under their own management plans. Alternatives B-1 and B-2 (the preferred alternative) opened for leasing about half the Reserve and substantially increased Special Areas and areas unavailable for leasing over the status quo. Alternative C opened for leasing more than three-quarters of the Reserve. Alternative D would have opened all of the Reserve for leasing.

40. The Record of Decision (ROD) chose Alternative B-2 from the Plan EIS and made "lands within NPR-A available for oil and gas leasing." Plan ROD at v, 15. In line with its programmatic nature, the Plan EIS did not decide the make-up of any future lease sale. Rather, it stated that "the first sale, as well as any subsequent sale, might offer only a portion of the lands identified in the record of decision as available, making possible a phased approach to leasing and development." Plan EIS Vol. 1, at 9. The Plan EIS did not analyze or compare alternative approaches to leasing and development in the areas open to leasing.

41. The Plan EIS did not calculate or analyze the effects of greenhouse gas emissions from the consumption of oil and gas produced from the program areas. The Plan EIS observed

that "[t]he assessed resources of billions of barrels of oil and tens of trillions of cubic feet of gas indicate that the NPR-A has been determined to have considerable resources." Plan EIS, Vol. 1, at 178. A 2010 U.S. Geological Survey assessment estimated technically recoverable oil resources at almost one billion barrels, with a one in 20 chance of recovering 2.7 billion barrels from the NPR-A. Yet the Plan EIS did not assess the effects of consuming oil and gas produced from the program areas. The EIS considered only the greenhouse gas emissions of oil and gas *operations* within the NPR-A, deeming them "minuscule." *Id.*, Vol. 2, at 97; *id.*, Vol. 4, at 76. It concluded: "since the specific effects of the proposed action, which may or may not contribute to climate change, cannot be determined, it is not possible to determine whether any particular action will lead to significant climate-related environmental effects." *Id.*, Vol. 4, at 76.

## IV. THE 2016 AND 2017 LEASE SALES

42. BLM has held annual lease sales under the Plan since 2013. Each lease sale since the adoption of the Plan has offered different numbers and configurations of tracts within the areas the Plan classified as open to leasing. Lease sales between 2013 and 2015 ranged in size from 1.4 million to 4.5 million acres, and offered leases in different parts of the Reserve from year to year.

43. In 2016, BLM offered leases in a relatively targeted area of 145 tracts, encompassing 1.45 million acres. At the 2016 lease sale, ConocoPhillips acquired an additional 594,972 acres in the Reserve, nearly doubling the 895,000 total acres already leased in the Reserve. All of the new leases are in the northeast corner of the Reserve, and a significant portion of this new acreage is in or near the Teshekpuk Lake Special Area or the Colville River Special Area.

44. The 2017 lease sale offered all 900 available tracts in the NPR-A, encompassing approximately 10.3 million acres, and seven tracts received bids. All seven of these tracts abut previously leased areas in the northeastern corner of the Reserve, near ConocoPhillips' ongoing projects.

45. BLM's decision in 2016 to target the northeastern portion of the Reserve for leases, and in 2017 to offer all of the open areas for leasing, may lead to environmental effects that are different and more severe than other leasing configurations BLM might have chosen.

46. For example, Teshekpuk Lake provides essential nesting and molting habitat for migratory birds from all over the world. These birds are vulnerable to the effects of oil and gas development. Gravel mining and deposition necessary for constructing oil and gas infrastructure destroys bird habitat, encroaching upon molting areas for brant and nesting grounds for ducks, geese, and shorebirds near Teshekpuk Lake. Aircraft flying at low altitudes may disturb molting geese in the vicinity of the lake. Molting demands energy and leaves geese flightless, making them especially vulnerable to disruptions, and some never become habituated to human activities.

47. Oil and gas infrastructure near Teshekpuk Lake, including south and east of the lake, could also displace caribou from areas that are essential for calving and rearing, insect relief, and migration at various times of the year. The use of heavy equipment and aircraft could disturb caribou that are calving or fleeing swarms of insects. Seismic surveys would likely drive away caribou overwintering in the eastern NPR-A, resulting in energy expenditures during a difficult time of year. Muskoxen near Teshekpuk Lake would be even more vulnerable to disturbance from seismic surveys, as they typically reduce movements and conserve energy during the winter.

48. The Colville River is biologically and geologically unique and is recognized as one of the most significant raptor habitats in North America. Allowing leasing in and near the Colville River Special Area, therefore, may have outsized impacts. Industry infrastructure located near the Colville River could compromise raptor nest sites and impair foraging habitats such as ponds, lakes, wetlands, and streambanks. Gravel mining from cliffs along the river would likely destroy nesting habitat. Power lines can electrocute raptors that become ensnared. Motorized vehicles, aircraft, heavy equipment, and seismic surveys may disturb nesting arctic peregrine falcons and gyrfalcons. Moose and muskoxen that concentrate along the Colville River in winter could expend energy to avoid seismic surveys and exploratory drilling activities. If pipelines near the river were built too low, they might impede moose movements.

49. This northeastern part of the Reserve is already the focus of industrial activity in the region. ConocoPhillips is actively exploring on some of its leases there, and several oil companies have announced recent discoveries that are likely to lead to development. For example, Caelus announced a large discovery in nearby Smith Bay in 2016, and ConocoPhillips announced a new discovery within the northeastern Reserve in 2017. Armstrong Energy is in the permitting process for a project bordering the Reserve, and ConocoPhillips' Greater Mooses Tooth-1 (GMT-1) development project in the northeastern Reserve was approved in 2015 and is moving forward.

50. The GMT-1 project demonstrates the types of harms oil leases can bring to the northeastern Reserve that are different from harms that might occur in other parts of the Reserve. When BLM permitted GMT-1, it waived stipulations and best management practices designed to protect special values, and acknowledged that the project's impacts on subsistence users would be much more severe than contemplated in the Plan EIS. The agency also noted that the

cumulative effects of future activities could exacerbate the impacts of GMT-1, resulting in significant, adverse, and long-term impacts to subsistence users in the nearby community of Nuiqsut. According to BLM, the project, together with other development in the same area of the Reserve, could draw down and pollute fish habitat, block fish movements, deplete bird habitat and forage areas, disturb caribou, and kill or displace nesting spectacled eiders, which are listed as threatened under the Endangered Species Act.

51. In addition to these differing impacts to surface values, BLM's lease sale choices could lead to different projections of oil and gas production and could have different resulting climate implications.

52. Notwithstanding the important values at stake and the differing effects of various lease sale configurations BLM might have chosen within the area open to leasing, BLM did not perform a NEPA analysis at the lease sale stage. Starting in 2014, BLM has purported to fulfill its NEPA obligations at the lease sale phase by producing Determinations of NEPA Adequacy. These determinations are very brief documents stating that the Plan EIS is adequate in all respects to serve as the required environmental review under NEPA for each new lease sale decision. Thus, BLM has declined to do any NEPA analysis for either the 2016 or the 2017 lease sale.

## CLAIMS FOR RELIEF

### I. FIRST CLAIM FOR RELIEF (NEPA VIOLATION)

53. Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

54. NEPA requires federal agencies to prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

55. Holding a lease sale in the Reserve is a major federal action that compels BLM to take a hard look at the effects of its action. The production of greenhouse gas emissions from the burning of fossil fuels produced in the Reserve is a reasonably foreseeable indirect and cumulative effect of the lease sales. In fact, the very purpose of leasing in the Reserve is to produce oil and gas for consumption. Likewise, negative impacts are a foreseeable effect of producing greenhouse gas emissions.

56. BLM did not conduct any analysis of the potential impacts of the greenhouse gas emissions resulting from the production and use of oil and gas that could result from the lease sales. The Plan EIS did not analyze these impacts for the plan as a whole or for any future lease sales, nor was there an analysis at the lease sale stage. BLM asserted in the 2016 Determination of NEPA Adequacy that it could not assess these impacts because data about development potential was unavailable.

57. At the time of the 2016 and 2017 lease sales, BLM had substantial information about potential oil and gas resources and announced discoveries in or near the Reserve; about tools for calculating emissions and their contribution to climate change; and about the effects of greenhouse gases on the local and global environment.

58. Notwithstanding its duty under NEPA and the availability of the information necessary to conduct the required analysis, BLM failed to take a hard look at the potential greenhouse gas emissions that would result from the 2016 and 2017 lease sales and the environmental effects of those emissions. In so doing, BLM acted arbitrarily and capriciously and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, and the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.

## II. SECOND CLAIM FOR RELIEF (NEPA VIOLATION)

59. Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

60. Under NEPA, an agency must develop and objectively evaluate in an EIS all reasonable alternatives to an action it proposes. 40 C.F.R. § 1502.14(a).

61. In deciding to proceed with the 2016 and 2017 lease sales, BLM relied entirely for its alternatives analysis on the Plan EIS. However, in its Plan EIS, BLM had reserved for the future lease sale phase decisions about the size, timing and location of leases in those areas left open to leasing. The Plan EIS did not analyze or compare alternative lease sale configurations, size, or timing in the open areas.

62. At the time of the 2016 and 2017 lease sales, BLM knew or should have known about differing levels and types of impacts that might occur from differently sized or configured lease sales. For example, BLM knew or should have known that leasing tracts in or near Teshekpuk Lake Special Area and the Colville River Special Area could have significant impacts that could be avoided by not offering those tracts in the 2016 and 2017 lease sales. BLM did not, however, develop or compare different lease sale alternatives at the lease sale phase.

63. BLM made decisions about the size and timing of leases in 2016 and 2017 without developing a range of lease sale configurations and comparing the environmental impacts of these various lease sale alternatives, despite the availability of information necessary to conduct the required analysis. Its decision was therefore arbitrary, capricious, and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. § 1502.14(a), and the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.

## PRAYER FOR RELIEF

Therefore, plaintiffs respectfully request that the Court:

1. Declare that defendants have violated NEPA and the Administrative Procedure Act;

2. Vacate the 2016 and 2017 lease sale decisions and any leases issued pursuant to those sales;

3. Enter any other appropriate injunctive relief to ensure that the defendants comply with NEPA and the Administrative Procedure Act, and to prevent irreparable harm to the plaintiffs and to the environment until such compliance occurs;

4. Award plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

5. Grant such other relief as the Court deems just and proper.

Dated this 2nd day of February, 2018.

Respectfully submitted,

*s/ Rebecca Noblin*
Rebecca Noblin (Alaska Bar No. 0611080)
EARTHJUSTICE

*s/ Erik Grafe*
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE

*Attorneys for Plaintiffs Natural Resources Defense Council, Center for Biological Diversity, Greenpeace, Inc., and Friends of the Earth*