Ryan P. Steen (Bar No. 0912084)
ryan.steen@stoel.com
Jason T. Morgan (Bar No. 1602010)
jason.morgan@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

Attorneys for ConocoPhillips Alaska, Inc.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, *et al*., <br><br>        Plaintiffs, <br><br>   v. <br><br> RYAN ZINKE, *et al*., <br><br>        Defendants. <br><br>   and <br><br> CONOCOPHILLIPS ALASKA, INC., <br><br>        Intervenor-Defendant. | Case No.: 3:18-cv-00031-SLG |

## CONOCOPHILLIPS ALASKA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT[1]

---

[1] Pursuant to L.R. 16.3(c), this response brief in opposition shall be deemed a cross-motion for summary judgment.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG

97074650.3 0028116-00135

TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND................................................................................................. 4

    A. NEPA and Determinations of NEPA Adequacy.............................................4

    B. The Petroleum Reserve. ................................................................................7

    C. The 2012 IAP EIS..........................................................................................11

    D. The 2016 and 2017 Lease Sales and Determinations of NEPA Adequacy. ......................15

III. STANDARD OF REVIEW OF AGENCY ACTION ........................................ 18

IV. ARGUMENT ...................................................................................................... 18

    A. NRDC's Claims Challenging the 2016 Lease Sale Are Barred by the Mineral
        Leasing Act's Statute of Limitations. ............................................................18

    B. All of NRDC's NEPA Claims Must Be Dismissed. ........................................22

        1. NRDC's Claims Are Contrary to Ninth Circuit Precedent Affirming the Use
            of an Identical NEPA Framework for the NPR-A at the Leasing Stage ....................22

        2. NRDC's Claims Challenging the Adequacy of the 2012 IAP EIS Are Barred
            by NPRPA's Statute of Limitations...............................................................27

        3. To the Extent Any of NRDC's Arguments Do Not Challenge the Adequacy of
            the 2012 IAP EIS, They Must Also Be Dismissed. .....................................32

            a. NRDC fails to show why BLM was required to supplement the 2012 IAP
                EIS to include the same climate change analysis NRDC demanded of
                BLM in 2012.................................................................................34

            b. BLM was not required to supplement the 2012 IAP EIS with a new NEPA
                analysis containing a new range of alternatives.................................37

    C. NRDC's Remedy Requests Are Premature. ....................................................44

        1. Vacatur Is Not the Appropriate Remedy. ...................................................45

            a. The NEPA violations alleged by NRDC are not so serious as to warrant
                vacatur.......................................................................................45

            b. Vacatur would have significant disruptive consequences. ....................47

         2. NRDC Establishes No Basis for a Permanent Injunction...........................48

V. CONCLUSION .................................................................................................... 50

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900 Fax 206.386.7500

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ..................................................................45, 46

*Ariz. Health Care Cost Containment Sys. v. McClellan*,
508 F.3d 1243 (9th Cir. 2007) ...........................................................................21

*Ayers v. Espy*,
873 F. Supp. 455 (D. Colo. 1994) .....................................................................43

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983) ..............................................................................................33

*Barnhart v. Walton*,
535 U.S. 212 (2002) ............................................................................................21

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ...........................................................................49

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) ......................................................................45, 47

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .............................................................................49

*Center for Biological Diversity v. National Highway Traffic Safety
Administration*,
538 F.3d 1172 (9th Cir. 2008) ...........................................................................37

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ............................................................................................33

*Coal. on Sensible Transp. v. Dole*,
826 F.2d 60 (D.C. Cir. 1987) .............................................................................18

*Concerned Citizens v. Sec'y of Transp.*,
641 F.2d 1 (1st Cir. 1981) ..................................................................................36

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ...............................................................25, 26, 48

*Cross Mountain Ranch Ltd. P'ship v. Vilsack*,
No. 09-cv-01902-PAB, 2012 WL 4359081 (D. Colo. Sept. 24, 2012) .................43

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

*Ctr. for Biological Diversity v. Kempthorne,*
588 F.3d 701 (9th Cir. 2009) ...................................................................5

*Ctr. for Biological Diversity v. U.S. Forest Serv.,*
349 F.3d 1157 (9th Cir. 2003) .................................................................5

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004).................................................................................30

*Douglas County v. Babbitt,*
48 F.3d 1495 (9th Cir. 1995) ...................................................................5

*Friends of Animals v. Bureau of Land Mgmt.,*
No. 2:16-cv-1670-SI, 2018 WL 1612836 (D. Or. Apr. 2, 2018)...............6

*Friends of Animals v. U.S. Bureau of Land Mgmt.,*
232 F. Supp. 3d 53 (D.D.C. 2017) ...............................................31, 33

*Friends of the Bitterroot, Inc. v. U.S. Forest Serv.,*
900 F. Supp. 1368 (D. Mont. 1994).......................................................43

*Friends of Endangered Species, Inc. v. Jantzen,*
596 F. Supp. 518 (N.D. Cal. 1984) ........................................................40

*Headwaters, Inc. v. Bureau of Land Mgmt.,*
914 F.2d 1174 (9th Cir. 1990) ...............................................................39

*High Country Conservation Advocates v. U.S. Forest Serv.,*
52 F. Supp. 3d 1174 (D. Colo. 2014)..............................................36, 37

*Idaho Farm Bureau Fed'n v. Babbitt,*
58 F.3d 1392 (9th Cir. 1995) ...........................................................45, 48

*Jones v. Gordon,*
792 F.2d 821 (9th Cir. 1986) ...........................................................19, 20

*Kunaknana v. U.S. Army Corps of Eng'rs,*
23 F. Supp. 3d 1063 (D. Alaska 2014) ......................................5, 10, 33

*League of Wilderness Defenders—Blue Mountain Biodiversity Project v. U.S.
Forest Serv.,*
689 F.3d 1060 (9th Cir. 2012) .................................................................5

*League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen,*
615 F.3d 1122 (9th Cir. 2010) .................................................................5

*Marathon Oil Co. v. United States,*
807 F.2d 759 (9th Cir. 1986) .................................................................39

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)..........................................................................................33, 36

*Mayo v. Reynolds*,
875 F.3d 11 (D.C. Cir. 2017) ......................................................................3, 27, 39

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
345 F.3d 520 (8th Cir. 2003) ......................................................................37

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)..........................................................................................48, 49

*Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*,
274 F. Supp. 3d 1074 (D. Mont. 2017)..........................................................36, 37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..........................................................................................18

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
783 F.3d 1301 (D.C. Cir. 2015) ......................................................................33

*N. Alaska Envtl. Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) ...................................................................... passim

*N. Slope Borough v. Andrus*,
642 F.2d 589 (1980)..........................................................................................5, 23

*Nat'l Comm. for the New River, Inc. v. FERC*,
373 F.3d 1323 (D.C. Cir. 2004) ......................................................................32

*Nat'l Indian Youth Council v. Watt*,
664 F.2d 220 (10th Cir. 1981) ......................................................................36

*Nat'l Wildlife Fed'n v. Espy*,
45 F.3d 1337 (9th Cir. 1995) ......................................................................45

*Native Village of Point Hope v. Jewell*,
740 F.3d 489 (9th Cir. 2014) ......................................................................23

*NRDC v. USFS*,
421 F.3d 797 (9th Cir. 2005) ......................................................................42

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*,
693 F.3d 1084 (9th Cir. 2012) ......................................................................40

*Pac. Rivers Council v. U.S. Forest Serv.*,
942 F. Supp. 2d 1014 (E.D. Cal. 2013)..........................................................45, 46, 49

Case 3:18-cv-00031-SLG   Document 28   Filed 07/24/18   Page 5 of 61

*Park County Resource Council, Inc. v. U.S. Department of Agriculture*,
   817 F.2d 609 (10th Cir. 1987) ...............................................19, 20

*Pollinator Stewardship Council v. EPA*,
   806 F.3d 520 (9th Cir. 2015) ...............................................46

*S. Utah Wilderness All. v. Norton*,
   457 F. Supp. 2d 1253 (D. Utah 2006) ...............................................8, 31

*Sierra Club v. Fed. Energy Regulatory Comm'n*,
   867 F.3d 1357 (D.C. Cir. 2017) ...............................................36, 37

*Sierra Club v. Slater*,
   120 F.3d 623 (6th Cir. 1997) ...............................................31

*Sierra Club v. United States*,
   23 F. Supp. 2d 1132 (N.D. Cal. 1998) ...............................................42

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
   671 F.3d 1113 (9th Cir. 2012) ...............................................4, 35

*Turtle Island Restoration Network v. U.S. Department of Commerce*,
   438 F.3d 937 (9th Cir. 2006) ...............................................20

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ...............................................40

*W. Oil & Gas Ass'n v. EPA*,
   633 F.2d 803 (9th Cir. 1980) ...............................................45

*W. Watersheds Project v. Abbey*,
   719 F.3d 1035 (9th Cir. 2013) ...............................................43

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
   376 F.3d 853 (9th Cir. 2004) ...............................................39

*WildEarth Guardians v. Bureau of Land Mgmt.*,
   870 F.3d 1222 (10th Cir. 2017) ...............................................36, 37

*WildEarth Guardians v. Salazar*,
   880 F. Supp. 2d 77 (D.D.C. 2012) ...............................................36

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*,
   353 F.3d 1051 (9th Cir. 2003) ...............................................18

**Statutes**

5 U.S.C. § 702 ...............................................18

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

5 U.S.C. § 706(2)(A) .................................................................................................17, 18, 45

16 U.S.C. § 1374(d)(6) ......................................................................................................19

16 U.S.C. § 1855(f) ............................................................................................................20

28 U.S.C. § 2401(a) ...........................................................................................................22

30 U.S.C. § 226-2 ........................................................................................................ passim

30 U.S.C. § 236a ................................................................................................................21

42 U.S.C. § 4321 ......................................................................................................... passim

42 U.S.C. § 4332 ...........................................................................................................8, 27

42 U.S.C. § 4332(2)(C) .......................................................................................................5

42 U.S.C. § 6501, *et seq.* ....................................................................................................1

42 U.S.C. § 6502 ................................................................................................................21

42 U.S.C. § 6504(b) .............................................................................................................9

42 U.S.C. § 6506a(a) ...........................................................................................................7

42 U.S.C. § 6506a(n)(1) .............................................................................................. passim

**Rules and Regulations**

40 C.F.R. § 1500.1 .............................................................................................................37

40 C.F.R. § 1502.1 .............................................................................................................37

40 C.F.R. § 1502.9(c) .....................................................................................................6, 32

40 C.F.R. § 1502.9(c)(1) ...................................................................................................32

40 C.F.R. § 1508.11 .............................................................................................................5

43 C.F.R. pt. 3000 ...............................................................................................................9

43 C.F.R. pt. 3130 ...............................................................................................................9

43 C.F.R. pt. 3150 ..........................................................................................................9, 10

43 C.F.R. pt. 3160 ..........................................................................................................9, 10

43 C.F.R. § 46.120 ...............................................................................................................6

43 C.F.R. § 46.120(c) ..................................................................................... passim

43 C.F.R. § 2361.1(a) ............................................................................................37

43 C.F.R. § 3000.5 .................................................................................................21

43 C.F.R. § 3130.0-2 ..............................................................................................27

43 C.F.R. § 3131.2 .................................................................................................25

43 C.F.R. § 3131.2(b) .......................................................................................37, 39

43 C.F.R. § 3131.3 .................................................................................................10

43 C.F.R. § 3162.3-1 ..............................................................................................10

43 C.F.R. § 3162.3-1(h)(1) .....................................................................................10

43 C.F.R. § 3162.3-1(h)(2) .....................................................................................10

48 Fed. Reg. 33,648 (July 22, 1983) ......................................................................21

77 Fed. Reg. 76,515 (Dec. 28, 2012) .....................................................................27

## Other Authorities

126 Cong. Rec. 29,489 (1980) .................................................................................8

Assessment of Undiscovered Oil and Gas Resources in the Cretaceous Nanushuk
    and Torok Formations, Alaska North Slope and Summary of Resource
    Potential of the National Petroleum Reserve in Alaska 2017 .................14, 17, 34, 35

Department of the Interior Appropriations Act, Fiscal year 1981 (Pub. L. 96-514) ....................21

http://dog.dnr.alaska.gov/Documents/Maps/ActivityMaps/NorthSlope/NS_Activit
    yMap_May2018.pdf .......................................................................................22

S. Rep. No. 96-985 (1980) ..................................................................................8, 32

U.S. Department of the Interior, Bureau of Land Management, SEIS, Record of
    Decision (Feb. 20, 2015), https://eplanning.blm.gov/epl-front-
    office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPag
    e&currentPageId=50912 .................................................................................25

U.S. Department of the Interior, Bureau of Land Management, Draft SEIS (June
    21, 2018), https://eplanning.blm.gov/epl-front-
    office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPag
    e&currentPageId=94250 .................................................................................25

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

U.S. Department of the Interior, Bureau of Land Management, Alaska Oil and
Gas Lease Sales, https://www.blm.gov/programs/energy-and-minerals/oil-
and-gas/leasing/regional-lease-sales/alaska .......................................................................11

U.S. Department of the Interior, Bureau of Land Management, National
Environmental Policy Act Handbook, H-1790-1, § 5.1 (Jan. 30, 2008).............................7, 33

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900 Fax 206.386.7500*

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page viii

# I. INTRODUCTION

This lawsuit challenges the decision by the Bureau of Land Management ("BLM") to offer leases for sale in 2016 and 2017 (the "2016 Lease Sale" and "2017 Lease Sale," respectively) in the National Petroleum Reserve in Alaska (the "Petroleum Reserve" or "NPR-A"). BLM offered the 2016 and 2017 Lease Sales pursuant to a comprehensive Integrated Activity Plan finalized in 2013 (the "2013 IAP") and in accordance with the requirements of the Naval Petroleum Reserves Production Act of 1976 ("NPRPA"), 42 U.S.C. § 6501, *et seq*. BLM's 2013 IAP—the product of President Obama's directive to conduct annual oil and gas lease sales in the Petroleum Reserve—is supported by a comprehensive, multi-volume environmental impact statement (the "2012 IAP EIS") of more than 2,000 pages, issued pursuant to the National Environmental Policy Act ("NEPA").

The "most important decisions" and "key issues" identified in the 2013 IAP and 2012 IAP EIS specifically addressed "what lands should be made available for oil and gas leasing."[2] In the 2013 IAP, BLM ultimately identified approximately 11.8 million acres of the Petroleum Reserve (approximately 52%) that would be "available" for oil and gas leasing, while closing approximately 11 million acres to leasing to protect other resource values.[3] Consistent with President Obama's mandate and the 2013 IAP, BLM offered annual lease sales in 2013, 2014, 2015, 2016, and 2017.

In the 2016 Lease Sale, BLM offered lease sales on 145 tracts or approximately 1.4 million acres of the 11.8 million acres made available by the 2013 IAP. Of those 145 tracts offered for sale, only 67 tracts received bids. In the 2017 Lease Sale, BLM offered lease sales on 10.3 million acres of the 11.8 million acres made available by the 2013 IAP. BLM only received

---

[2] AR 0006, 0007.

[3] AR 0036, 0037.

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900    Fax 206.386.7500*

seven bids on less than 80,000 acres. Both lease sales were "part of the preferred alternative previously analyzed in the IAP/EIS."[4] Prior to finalizing these lease sales, BLM reviewed the 2012 IAP EIS to make sure that there was no new information demonstrating significant impacts that were not addressed in that EIS. BLM found no such new information, and documented that review in the administrative records for both sales.

Plaintiffs Natural Resources Defense Council et al. (collectively, "NRDC") did not challenge the 2012 IAP EIS, the 2013 IAP, or any of the lease sales issued in 2013, 2014, and 2015. Having remained silent for years while BLM carried out its transparent plan for leasing in the Petroleum Reserve, only now does NRDC object, arguing that the 2016 and 2017 Lease Sales violate NEPA on the grounds that (1) the 2012 IAP EIS did not sufficiently address indirect, downstream climate effects that could result from NPR-A leasing and (2) BLM should have prepared a second EIS to evaluate alternatives to the alternative selected in the 2012 IAP EIS.

As an initial matter, NRDC's challenges to the 2016 Lease Sale are time-barred. All lawsuits "involving any oil and gas lease" must be "commenced or taken within ninety days after the final decision of the Secretary relating to such matter."[5] NRDC's lawsuit plainly involves an oil and gas lease because it "ask[s] the court to vacate the lease sale decisions and cancel the leases," or, alternatively, "enjoin activities on leases."[6] The limitations period expired long ago, and NRDC's claims challenging the 2016 Lease Sale must therefore be dismissed.

In addition, NRDC's NEPA claims challenging both the 2016 Lease Sale and the 2017 Lease Sale are barred by the NPRPA's statute of limitations. The NPRPA places a strict 60-day

---

[4] AR 9514; AR 2904.

[5] 30 U.S.C. § 226-2.

[6] Plaintiffs' Principal Brief Under Local Rule 16.3(c)(1) (Dkt. 25) ("NRDC Br.") at 31, 32.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 2

97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900  Fax 206.386.7500

limitations period on any challenge to the "adequacy" of any EIS "concerning oil and gas leasing in the National Petroleum Reserve—Alaska."[7] NRDC has missed its filing deadline by nearly five years. In the 2013 IAP and 2012 IAP EIS, BLM already decided "what lands should be made available for oil and gas leasing."[8] As the Record of Decision for the 2013 IAP states: "This decision makes approximately 11.8 million acres available for oil and gas leasing."[9] If NRDC believed that BLM's decision in 2013 to lease 11.8 million acres of the Petroleum Reserve was inadequately analyzed under NEPA (on climate change grounds or otherwise) or failed to adequately consider alternatives, then NRDC was required to file those claims within 60 days of publication of the 2012 IAP EIS. NRDC failed to do so, and its claims are barred by the NPRPA's statute of limitations specifically applicable to NEPA adequacy claims.[10]

In any event, NRDC's claims have no substantive merit and are premised on a misunderstanding of the NPRPA's leasing program as merely an overarching programmatic land use plan that requires a more specific NEPA analysis prior to each lease sale. The fundamental problem with this argument is that the 2013 IAP expressly "authorize[s] multiple lease sales," including the two lease sales at issue here. BLM is "not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action," or needlessly "repeat" that exercise over and over again for each annual lease sale.[11] Moreover, the Ninth Circuit has already reviewed and approved this exact approach to leasing and NEPA review *in the Petroleum Reserve*.[12]

---

[7] 42 U.S.C. § 6506a(n)(1).

[8] AR 0006-0007.

[9] AR 2628.

[10] 42 U.S.C. § 6506a(n)(1).

[11] *Mayo v. Reynolds*, 875 F.3d 11, 16, 21 (D.C. Cir. 2017) (rejecting argument that agency must conduct a new NEPA analysis each year for a multi-year program).

[12] *See N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 3
97674850.3 0028116-00133

Before issuing the leases, BLM was simply required to (and did) determine whether "new circumstances, new information or changes in the action or its impacts not previously analyzed may result in *significantly different* environmental effects."[13] Based on that review, BLM may be required to supplement its existing EIS if the changes or new information demonstrates a "*seriously* different picture of the likely environmental harms stemming from the proposed project."[14] NRDC does not even cite to this standard, let alone demonstrate that it is met. BLM conducted the required review prior to each lease sale, documented that review in the administrative record, and reasonably concluded that there was no information requiring supplementation.

For these reasons, and those discussed more fully below, NRDC's claims have no merit and its summary judgment motion should be denied. Intervenor-Defendant ConocoPhillips Alaska, Inc. ("CPAI") respectfully requests that this Court grant summary judgment in favor of BLM and CPAI, and uphold the leases issued under a competitive leasing program that has spanned two presidential administrations over the past six years, following an approach that was approved by the Ninth Circuit over a decade ago.

## II. BACKGROUND

A.    **NEPA and Determinations of NEPA Adequacy.**

NEPA declares "a national policy ... to promote efforts which will prevent or eliminate damage to the environment."[15] NEPA is a "procedural statute, designed to achieve its stated policy 'by focusing Government and public attention on the environmental effects of proposed

---

[13] 43 C.F.R. § 46.120(c) (emphasis added).

[14] *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (emphasis added; internal quotation marks and citation omitted).

[15] 42 U.S.C. § 4321.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 4
97674850.3 0028116-00133

action.'"[16] Regulations promulgated by the Council for Environmental Quality ("CEQ") provide guidance on the application of NEPA.[17]

NEPA requires federal agencies to prepare an EIS before undertaking "major Federal actions significantly affecting the quality of the human environment."[18] Preparation of an EIS ensures that an agency gives proper consideration to the environmental consequences of a proposed action and the relevant information is made available to the public.[19] NEPA requires agencies to take "'a "hard look" at the potential environmental consequences of [their] proposed action.'"[20]

By nature, an EIS is inherently predictive and necessarily requires the agency to exercise its reasoned judgment in predicting future events.[21] As a result, an EIS involves some uncertainty as to future effects.[22] This "uncertainty is an inherent problem with multi-stage projects such as oil and gas programs, which include separate leasing, exploration, and development stages."[23] Courts give "great deference" to predictive judgments made by an agency in these circumstances, so long as the "agency complies in good faith with the requirements of NEPA and

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

---

[16] *Kunaknana v. U.S. Army Corps of Eng'rs*, 23 F. Supp. 3d 1063, 1070 (D. Alaska 2014) (citation omitted).

[17] *Id.*

[18] 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11.

[19] *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003); *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995).

[20] *See League of Wilderness Defenders—Blue Mountain Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012) (quoting *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1135 (9th Cir. 2010)).

[21] *See id.* at 1076-77.

[22] *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (A "quotient of uncertainty ... is always present when making predictions about the natural world.").

[23] *N. Alaska Envtl. Ctr.*, 457 F.3d at 977 (citing *N. Slope Borough v. Andrus*, 642 F.2d 589, 600 (1980)).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 5

issues an EIS indicating that the agency has taken a hard look at the pertinent environmental questions."[24]

When an agency decision "has already been subject to NEPA review, an agency may be required to prepare a supplemental analysis."[25] The CEQ's regulations explain that a supplemental NEPA analysis may be required if "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[26] Similarly, BLM's NEPA regulations encourage the use of existing NEPA documents,[27] and provide that it may use an "existing environmental analysis ... in its entirety if the Responsible Official determines, with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives."[28] This requires an "evaluation of whether new circumstances, new information or changes in the action or its impacts ... may result in *significantly different* environmental effects."[29]

BLM's NEPA Handbook explains the procedures for making the supplementation decision through a "determination of NEPA Adequacy" (or "DNA").[30] According to the NEPA Handbook, a DNA "confirms that an action is adequately analyzed in existing NEPA

[24] *Id.*

[25] *Friends of Animals v. Bureau of Land Mgmt.*, No. 2:16-cv-1670-SI, 2018 WL 1612836, at *10 (D. Or. Apr. 2, 2018).

[26] 40 C.F.R. § 1502.9(c).

[27] 43 C.F.R. § 46.120.

[28] 43 C.F.R. § 46.120(c).

[29] *Id.* (emphasis added).

[30] *Friends of Animals*, 2018 WL 1612836, at *9.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

97674850.3 0028116-00133

document(s) and is in conformance with the land use plan."[31] The NEPA Handbook instructs officials to review existing environmental documents and answer several questions geared at determining whether a prior document adequately analyzes a proposed action.[32] The NEPA Handbook recommends the use of a "DNA worksheet" that "documents the review to determine whether the existing NEPA documents can satisfy the NEPA requirements for the proposed action."[33]

## B.    The Petroleum Reserve.

President Harding established Naval Petroleum Reserve No. 4 on Alaska's North Slope in 1923.[34] In 1976, Congress enacted the NPRPA and transferred authority over the Petroleum Reserve from the Navy to the Secretary of Interior.[35] The Petroleum Reserve, which is administered by BLM, was subsequently renamed the National Petroleum Reserve in Alaska (often abbreviated NPR-A).[36] The Petroleum Reserve remains the largest single unit of public land in the United States, encompassing approximately 23.6 million acres (22.8 million acres of which are under federal management), an area roughly the size of the state of Indiana.[37]

In 1980, Congress amended the NPRPA to direct the Secretary of the Interior to carry out an "expeditious program of competitive leasing of oil and gas" within the Petroleum Reserve, while recognizing the need to protect the environment.[38] The desire for expeditious development

---

[31] *See* U.S. Department of the Interior, Bureau of Land Management, National Environmental Policy Act Handbook, H-1790-1, § 5.1 (Jan. 30, 2008) ("NEPA Handbook").

[32] *Id.*

[33] *Id.* § 5.1.3.

[34] *N. Alaska Envtl. Ctr.*, 457 F.3d at 973.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] Department of the Interior Appropriations Act, Fiscal Year 1981 (Pub. L. No. 96-514) (codified at 42 U.S.C. § 6506a(a)).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 7

97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

was driven by the fuel crisis of the 1970s,[39] and the recognition that "we can no longer delay efforts which would increase the domestic supply of oil and gas and lessen our reliance on imports."[40] At the time, the administration was projecting that "it would be at least 5 years before any actual leasing could take place."[41] But the "[m]embers of the Appropriations Committees of both the House and the Senate ... determined that such a delay is intolerable" and, accordingly, Congress amended the Act to "expeditiously move to a private exploration program."[42]

Among other measures intended to ensure expeditious development of the Petroleum Reserve, the 1980 amendments "assure[d] minimum delays" by including "language providing for accelerated judicial review."[43] Challenges to *all* federal oil and gas lease decisions were already subject to a 90-day limitations period.[44] The 1980 amendments at 42 U.S.C. § 6506a(n)(1) accelerated that timetable for NEPA-related lawsuits, expressly requiring that

> [a]ny action seeking judicial review of the adequacy of any program or site-specific environmental impact statement under section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) concerning oil and gas leasing in the National Petroleum Reserve-Alaska shall be barred unless brought in the appropriate District Court within 60 days after notice of the availability of such statement is published in the Federal Register.[45]

Thus, any challenge to the adequacy of an EIS concerning oil and gas leasing must be promptly filed within 60 days or "be barred."

---

[39] *N. Alaska Envtl. Ctr.*, 457 F.3d at 973.

[40] 126 Cong. Rec. 29,489 (1980) (statement of Sen. Stevens).

[41] *Id.*

[42] *Id.*

[43] S. Rep. No. 96-985, at 34 (1980).

[44] 30 U.S.C. § 226-2 ("No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter.").

[45] 42 U.S.C. § 6506a(n)(1).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

The NPRPA also assures that environmental concerns and values are served in a variety of ways, including the protection of areas "designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value[.]"[46] Pursuant to this provision, five "Special Areas" have been established in the Petroleum Reserve: the *Teshekpuk Lake Special Area* to protect migratory waterfowl and shorebirds, important caribou habitat, and subsistence uses; the *Colville River Special Area* to protect the arctic peregrine falcon nesting areas; the *Utukok River Uplands Special Area* to protect important habitat of the Western Arctic Herd of caribou; the *Kasegaluk Lagoon Special Area* to protect marine mammal habitat; and the *Peard Bay Special Area* to protect high-value marine mammal, shorebird, and water bird habitats.[47]

For portions of the Petroleum Reserve where leasing is allowed, BLM's administration occurs through a three-phase process: (1) leasing; (2) exploration; and (3) development.[48] Each stage is subject to independent decision-making and approval by BLM (as well as other local, state, and federal agencies), and each stage requires review and analysis under NEPA.[49]

The *leasing stage* is just the first step towards exploration and development, and the leases do not themselves authorize any on-the-ground activity.[50] At the leasing stage, BLM determines which lands to make available for leasing, which lands to defer or make unavailable, and which protective stipulations and other mitigation measures to apply to protect surface

---

[46] 42 U.S.C. § 6504(b).

[47] AR 0031, 0035.

[48] *N. Alaska Envtl. Ctr.*, 457 F.3d at 977; *see* 43 C.F.R. pts. 3000, 3130, 3150, 3160.

[49] *N. Alaska Envtl. Ctr.*, 457 F.3d at 977.

[50] AR 2645.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 9

97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900  Fax 206.386.7500

resources.[51] In the Petroleum Reserve, the "leasing stage" involves both the lease plan and the lease sales held under that plan.[52]

At the *exploration stage*, the leaseholder may conduct surface-disturbing activities such as geophysical exploration, seismic surveys, or the drilling of subsurface or exploratory wells, but only after obtaining additional permits from BLM.[53] BLM may approve the exploration plan as submitted, reject it, or impose "[a]dditional stipulations needed to protect surface resources and special areas ... at the time the surface use plan and permit to drill are approved."[54] Exploration activities are subject to NEPA review and analysis.

The *development stage* depends on the results of exploration, because "until the lessees do exploratory work, the government cannot know what sites will be deemed most suitable for exploratory drilling, much less for development."[55] The development stage may involve more extensive surface activities and requires BLM's approval of a drilling and surface use operations plan.[56] The development plan, and other approvals such as Army Corps permitting, are also subject to additional NEPA review and analysis.[57]

Historically, BLM split the Petroleum Reserve into two areas and issued leasing plans for those areas. For example, on January 22, 2004, BLM issued the Northwest NPR-A Integrated Activity Plan and associated EIS addressing BLM's "plan to offer long term oil and gas leases" in the Northwest Planning Area.[58] In conducting that analysis, BLM realized that it "had no way

---

[51] *Id.*

[52] *N. Alaska Envtl. Ctr.*, 457 F.3d at 976-77.

[53] 43 C.F.R. pts. 3150, 3160.

[54] 43 C.F.R. §§ 3131.3, 3162.3-1(h)(1), (2).

[55] *N. Alaska Envtl. Ctr.*, 457 F.3d at 976.

[56] 43 C.F.R. § 3162.3-1.

[57] *See, e.g., Kunaknana*, 23 F. Supp. 3d at 1072-73.

[58] *N. Alaska Envtl. Ctr.*, 457 F.3d at 972.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 10

97674850.3 0028116-00133

of knowing what, if any, areas subsequent exploration would find most suitable for drilling."[59]

Accordingly, instead of addressing specific parcels, BLM "projected two hypotheticals, representing each end of the available spectrum of possibilities" for development of offered leases.[60] This Court and the Ninth Circuit affirmed this approach to Petroleum Reserve leasing in *Northern Alaska Environmental Center v. Kempthorne*, finding that this level of analysis was appropriate for the "leasing stage."[61] BLM issued multiple lease sales in 2004, 2006, 2008, 2010, 2011, and 2012, all of which were premised on the two regional plans and the IAP EISs prepared with those plans.[62]

## C. The 2012 IAP EIS.

On May 14, 2011, President Obama directed the Department of the Interior to conduct annual oil and gas lease sales in the Petroleum Reserve.[63] BLM responded by developing and finalizing the 2013 IAP, which covers the entire Petroleum Reserve.[64] The 2013 IAP updated and superseded the prior regional IAPs.[65] The 2013 IAP makes approximately 11.8 million acres available for oil and gas leasing.[66] The 2013 IAP also makes approximately 11 million acres *not* available for oil and gas leasing.[67] The 2013 IAP expands the Teshekpuk Lakes Special Area from 1.75 million acres to 3.65 million acres, expands the Utukok River Uplands Special Area from 3.97 million acres to 7.06 million acres, and creates a new 107,000-acre Peard Bay Special

---

[59] *Id.* at 974.

[60] *Id.*

[61] *Id.* at 977.

[62] *See* U.S. Department of the Interior, Bureau of Land Management, Alaska Oil and Gas Lease Sales, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/alaska (last visited July 19, 2018).

[63] AR 0006.

[64] AR 2623-2736.

[65] AR 0006.

[66] AR 2628.

[67] *Id.*

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

97674850.3 0028116-00133

Area.[68] The 2013 IAP also establishes performance-based stipulations and best management practices applicable to oil and gas activities in the Petroleum Reserve, and restricts surface infrastructure (even in many areas open to leasing).[69]

The 2013 IAP is supported by the robust and comprehensive 2012 IAP EIS.[70] The 2012 IAP EIS "analyzes a range of management options for the entire NPR-A."[71] The "key issues" in the 2012 IAP EIS "are decisions on the location and amount of oil and gas leasing and protection of surface resources."[72] To that end, the 2012 IAP EIS "contains five alternatives that provide a broad range of oil and gas leasing availability, surface protections, and Special Area designations."[73] These alternatives include:

- Alternative A is the no action alternative. Under Alternative A, BLM would continue to manage the Petroleum Reserve under the existing programs. This alternative would allow leasing of 57% (13 million acres) of the Petroleum Reserve, and leave existing Special Area protections in place.[74]

- Alternative B-1 emphasizes the protection of surface resources while making 48% of the Petroleum Reserve (11 million acres) available for leasing. Alternative B-1 would enlarge three Special Areas and create one new Special Area. It would also recommend Congressional designation of all or portions of 12 rivers for inclusion in the National Wild and Scenic Rivers System.[75]

- Alternative B-2 is similar to Alternative B-1 and was developed in response to public comments (including those from NRDC). The alternative would make 52% of the Petroleum Reserve available for leasing (11.8 million acres). Alternative B-2 would enlarge two Special Areas and create one new Special Area.[76]

- Alternative C makes 75% of the Petroleum Reserve available for leasing (17.9 million acres). This alternative would protect approximately 4.4 million acres in the

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

---

[68] *Id.*

[69] *Id.*

[70] AR 0001-2622.

[71] AR 0006.

[72] AR 0007.

[73] AR 0008.

[74] AR 0033-0034.

[75] AR 0034-0036.

[76] AR 0036-0039.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 12
97674850.3 0028116-00153

southern part of the Petroleum Reserve, and in the existing Kasegaluk Lagoon Special Area and newly created Peard Bay Special Area.[77]

- Alternative D would maximize leasing opportunities within the Petroleum Reserve. All lands would be made available for leasing. Lands within Special Areas would still receive special protections, but would be less restrictive than other alternatives.[78]

The similar Alternatives B-1 and B-2 set aside substantially more areas for conservation than the pre-2013 status quo (Alternative A). Environmental organizations, including NRDC, stated that they "strongly support Alternative B, as it would protect the Reserve's extraordinary and globally significant wildlife, subsistence and wilderness resources that are deserving of the highest levels of protection."[79] The State of Alaska and industry groups, on the other hand, opposed Alternatives B and C, and supported Alternative D as more consistent with the development policies of the NPRPA.[80] BLM ultimately sided with the environmental organizations and selected Alternative B-2 for the 2013 IAP, explaining that "[t]his decision makes approximately 11.8 million acres of the approximately 22.8 million acres of subsurface managed by BLM in the NPR-A available for oil and gas leasing."[81]

As with the 2004 IAP EIS approved by this Court in *Northern Alaska Environmental Center v. Kempthorne*, the 2012 IAP EIS recognized the difficulties associated with predicting the on-the-ground impacts of future development from the proposed set of leasing alternatives due to the "many uncertainties associated with projecting future petroleum exploration and

---

[77] AR 0039-0040.

[78] AR 0040-0041.

[79] AR 2025.

[80] *See* AR 1768-1769, 2084, 2140, 2147. The North Slope Borough took a middle-ground position, arguing for a variation on Alternative A and disagreed with the environmental groups' support for Alternative B and with the State's and industry groups' support for Alternative D. *See* AR 1752. BLM's final decision was more aligned with environmental groups than with the North Slope Borough, the State, or industry groups.

[81] AR 2632.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 13

97674850.3 0028116-00033

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

development."[82] To "address these uncertainties, the BLM has made reasonable assumptions" based on the following: (1) a 2011 United States Geological Service ("USGS") economic assessment (the "2011 USGS economic analysis"); (2) BLM's "own knowledge of the largely undiscovered petroleum endowment of the planning area and current industry practice"; and (3) BLM's "professional judgment."[83] BLM worked carefully and conservatively "to minimize the chance that the resultant impact analysis will understate potential impacts."[84] For example, BLM made price assumptions "at the upper level of current government projections," thereby making development seem more likely (for planning purposes), and assumed that the "amount of infrastructure" needed by each development would be at "upper, but reasonable, limits."[85]

In addition, the 2012 IAP EIS makes numerous assumptions that contemplate "an optimistic set of development scenarios."[86] For instance, BLM assumed that (1) "[m]ultiple lease sales would be held," (2) "[i]ndustry would aggressively lease and explore the tracts offered," and (3) "[s]everal industry groups would independently explore and develop new fields."[87] The 2012 IAP EIS then proceeds to carefully discuss the potential on-the-ground activities associated with this likely development scenario for each of the five alternatives.[88]

In expressly "authoriz[ing] multiple lease sales," BLM explained that the first lease sale based on the 2012 IAP EIS "most likely would occur in 2013, with subsequent annual lease sales."[89] The 2012 IAP EIS was clear that "[r]eaders should bear in mind, however, that the first

---

[82] AR 0581.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] AR 0585-0614.

[89] AR 0023.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 14

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

sale, as well as any subsequent sale, might offer only a portion of the lands identified in the record of decision."[90] The 2012 IAP EIS explained that "[p]rior to conducting each additional sale, the agency would conduct a determination of the existing NEPA documentation's adequacy."[91] Based on that review, "[i]f the BLM finds its existing analysis to be adequate for a second or subsequent sale, the NEPA analysis for such sales may require only an administrative determination of NEPA adequacy."[92] But future activities requiring BLM approval, such as a "proposed exploratory drilling plan" or "proposed construction of infrastructure for development of a petroleum discovery ... would require further NEPA analysis."[93]

As indicated above, numerous environmental groups, including NRDC, commented at length on the Draft IAP EIS, and BLM responded to their comments with detailed explanations and with changes to the 2012 IAP EIS.[94] No party challenged or appealed the 2013 IAP or the 2012 IAP EIS within the 60-day deadline set forth in 42 U.S.C. § 6506a(n)(1). In fact, no party challenged the 2013 IAP, the 2012 IAP EIS, or any of the annual lease sales held thereunder until the present lawsuit and its companion lawsuit were filed in 2018.

**D.     The 2016 and 2017 Lease Sales and Determinations of NEPA Adequacy.**

As contemplated by the 2012 IAP EIS, BLM proceeded to conduct annual lease sales from 2013 through 2018. As relevant here, on December 14, 2016, BLM offered a lease sale for 145 tracts or approximately 1.4 million acres, all located within the 11.8 million acres made available by the 2013 IAP.[95] Of those 145 tracts offered for sale, only 67 tracts received bids.[96]

---

[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *See, e.g.,* AR 2048-2051 (responses to comments by NRDC).
[95] AR 2903.
[96] AR 3033.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 15

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

On December 6, 2017, BLM offered 900 tracts encompassing approximately 10.3 million acres, all located within the 11.8 million acres made available by the 2013 IAP.[97] Of those 900 tracts, only seven received bids (all by CPAI),[98] comprising approximately 79,998 acres (or about 0.8% of the 10.3 million acres offered for lease).[99]

Before conducting these sales, BLM documented determinations of NEPA adequacy as expressly contemplated in the 2012 IAP EIS.[100] BLM followed the instructions in its NEPA Handbook and used the DNA Worksheet to evaluate whether there was new information impacting the 2012 IAP EIS.[101] BLM's DNAs in 2016 and 2017 explain that the "current proposal is part of the preferred alternative previously analyzed in the IAP/EIS."[102] The two proposed sales were "within the area analyzed" by the 2012 IAP EIS, and within the "range of alternatives" contemplated by the 2012 IAP EIS.[103] BLM then reasonably concluded that there "is no new information or circumstances that would substantially change the analysis for the proposed lease sale," and that the direct, indirect, and cumulative effects from the lease sales "are similar and essentially unchanged from those identified in the multiple sale analysis in the NPR-A IAP/EIS, both from a quantitative and qualitative standpoint."[104] Accordingly, BLM reasonably concluded "that the existing NEPA documentation fully covers the proposed action and constitutes BLM's compliance with the requirements of NEPA."[105] BLM similarly

---

[97] AR 9513.

[98] CPAI and Anadarko E&P Onshore, LLC ("Anadarko") jointly purchased all seven leases in the 2017 Lease Sale and 65 leases in the 2016 Lease Sale. CPAI has since acquired all of Anadarko's interest in those leases. *See* Dkt. 11, Declaration of John F. Schell, Jr. ("Schell Decl.") ¶¶ 7-9.

[99] AR 9711.

[100] AR 0023; AR 2903-2908; AR 9513-9516.

[101] AR 9514.

[102] AR 9514; AR 2904.

[103] *Id.*

[104] AR 9514-9515; AR 2904-2905.

[105] AR 9516; AR 2907.

97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

documented its NEPA compliance with DNAs for the 2013, 2014, and 2015 lease sales, none of which were challenged by NRDC.[106]

After BLM conducted its 2017 Lease Sale, but before BLM signed or finalized any of the leases, the USGS published, on December 22, 2017, a three-page *Assessment of Undiscovered Oil and Gas Resources in the Cretaceous Nanushuk and Torok Formations, Alaska North Slope and Summary of Resource Potential of the National Petroleum Reserve in Alaska 2017* (the "2017 USGS assessment").[107] This assessment addressed recently announced oil and gas discoveries in and near the Petroleum Reserve, and "upwardly revised" the USGS's "estimates of mean undiscovered, technically recoverable oil and gas resources for those formations."[108] Because BLM had not yet taken final action on the leases, BLM considered this new information to determine whether the 2012 IAP EIS "remain[s] adequate to provide NEPA compliance."[109]

BLM carefully reviewed the information in the 2017 USGS assessment in an updated DNA Worksheet (the "Revised DNA Worksheet"). BLM again concluded that this new information does not alter its view of the impacts of the 2017 Lease Sale, and documented that review in the Revised DNA Worksheet, signed on February 21, 2018. BLM then signed the seven leases for the 2017 Lease Sale on the next day, February 22, 2018.[110, 111]

---

[106] *See* Alaska Oil and Gas Lease Sales, *supra* note 62.

[107] AR 11691-11694.

[108] AR 9723.

[109] *Id.*

[110] AR 9732 (Lease Serial No. AA-094578 for Tract 2017-L-079); AR 9737 (Lease Serial No. AA-094579 for Tract 2017-L-080); AR 9742 (Lease Serial No. AA-094580 for Tract 2017-L-081); AR 9747 (Lease Serial No. AA-094581 for Tract 2017-L-083); AR 9752 (Lease Serial No. AA-094582 for Tract 2017-L-108); AR 9757 (Lease Serial No. AA-094583 for Tract 2017-L-110); AR 9762 (Lease Serial No. AA-094584 for Tract 2017-L-111).

[111] As BLM explains in its briefing, NRDC prematurely filed its complaint before BLM executed the 2017 leases, and thus before final agency action subject to review under 5 U.S.C. § 706(2)(A), thereby providing an additional basis for dismissing NRDC's 2017 Lease Sale claims.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 17

# III. STANDARD OF REVIEW OF AGENCY ACTION

NRDC asserts that the 2016 and 2017 Lease Sales violate NEPA. It seeks judicial review

of BLM's decision under the Administrative Procedure Act ("APA"), which provides that "[a]

person suffering legal wrong because of agency action, or adversely affected or aggrieved by

agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[112]

The APA directs courts to "hold unlawful and set aside" an agency decision that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."[113] The Supreme

Court has held that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow

and a court is not to substitute its judgment for that of the agency."[114] "The NEPA process

involves an almost endless series of judgment calls" and "[t]he line-drawing decisions

necessitated by this fact of life are vested in the agencies, not the courts."[115]

# IV. ARGUMENT

A. **NRDC's Claims Challenging the 2016 Lease Sale Are Barred by the Mineral Leasing Act's Statute of Limitations.**

As a threshold matter, NRDC is barred from challenging the 2016 Lease Sale and

associated leases because the Mineral Leasing Act's ("MLA") 90-day statute of limitations for

challenging leasing decisions has expired. Under 30 U.S.C. § 226-2, "[n]o action contesting a

decision of the Secretary involving any oil and gas lease shall be maintained unless such action is

commenced or taken within ninety days after the final decision of the Secretary relating to such

matter." NRDC expressly "challenge[s] the Bureau of Land Management's (BLM) decision to

---

[112] 5 U.S.C. § 702; *see also Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc) ("The Administrative Procedure Act ('APA') governs judicial review of agency action.").
[113] 5 U.S.C. § 706(2)(A).
[114] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
[115] *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 18

97674850.3 0028116-00153

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

hold oil and gas lease sales" and "ask[s] the court to vacate the lease sale decision and cancel the leases" or alternatively "enjoin activity on the leases."[116]

Accordingly, NRDC contests "a decision of the Secretary involving any oil and gas lease" and its claims squarely fall within the scope of 30 U.S.C. § 226-2. It is undisputed that the lease sale was completed on December 14, 2016 (and the leases were signed shortly thereafter)[117] and that NRDC did not file its lawsuit until more than a year later, on February 2, 2018. Because NRDC's claims challenging the 2016 Lease Sale were filed well after the 90-day statute of limitations, they are barred under 30 U.S.C. § 226-2.

CPAI expects that NRDC will attempt to avoid this fatal flaw by relying (erroneously) on the Tenth Circuit's decision in *Park County Resource Council, Inc. v. U.S. Department of Agriculture*.[118] In *Park County*, the Tenth Circuit held that the 90-day limitations period in 30 U.S.C. § 226-2 does not apply to a NEPA claim made in a lawsuit that "happen[s] to involve an oil and gas lease."[119] To reach this conclusion, the Tenth Circuit relied extensively on the Ninth Circuit's decision in *Jones v. Gordon*.[120] In *Jones*, the Ninth Circuit held that the Marine Mammal Protection Act's 60-day statute of limitations applicable to "'judicial review *of the terms and conditions of any permit* issued by the Secretary'" did *not* preclude a procedural challenge under NEPA.[121] However, the Ninth Circuit subsequently found that *Park County* misinterpreted and misapplied *Jones*.

---

[116] NRDC Br. at 1, 31-32.

[117] *See, e.g.*, AR 3084-3086.

[118] 817 F.2d 609 (10th Cir. 1987), *overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992) (overruling *Park County* on NEPA's standard of review).

[119] *Id.* at 616.

[120] 792 F.2d 821 (9th Cir. 1986).

[121] *See Park Cty.*, 817 F.2d at 616 (emphasis added) (quoting 16 U.S.C. § 1374(d)(6)).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 19

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

97674850.3 0028116-00133

Specifically, in *Turtle Island Restoration Network v. U.S. Department of Commerce*, the Ninth Circuit explained that *Park County* was *wrongly decided* because it disregarded "the broad wording of the jurisdictional provision in that case," and was simply "another misapplication of *Jones*."[122] The Ninth Circuit rejected the idea that *Jones* should be read broadly for the "general proposition that plaintiffs raising NEPA-only challenges may always proceed pursuant to the APA rather than pursuant to a more limited substantive statute."[123] The court explained that such an interpretation is "mistaken" because the statute of limitations in *Jones* was narrow and applied only to "judicial review of the *terms and conditions*" of permits.[124] Instead, the plaintiffs' NEPA claims in *Turtle Island* were barred by a 30-day statute of limitations under the Magnuson Stevens Fishery Conservation and Management Act, which applies to "'[r]egulations promulgated by the Secretary under this chapter,'" because NEPA-based challenges to a regulation "cannot credibly be viewed as anything other than an attack on the regulations."[125] The Ninth Circuit's explicit rejection of *Park County*—which involved the same statute of limitations provision at issue here—conclusively forecloses any reliance by NRDC on that case.

Additionally, CPAI anticipates that NRDC may argue (again erroneously) that 30 U.S.C. § 226-2 does not apply to leasing in the Petroleum Reserve, which is subject to the NPRPA's leasing provisions. As explained below, although some provisions of the MLA do not apply to leasing in the Petroleum Reserve, 30 U.S.C. § 226-2 is *not* one of those provisions.

The NPRPA states that the Petroleum Reserve is "hereby reserved and withdrawn from all forms of entry and disposition under the public land laws, including the mining and mineral

---

[122] 438 F.3d 937, 947 n.9 (9th Cir. 2006).

[123] *Id*. at 947.

[124] *Id*. at 946-47 (internal quotation marks and citation omitted).

[125] *Id*. at 943, 945 (quoting 16 U.S.C. § 1855(f)).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 20

97674850.3

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900 Fax 206.386.7500

leasing laws, and all other Acts."[126] Accordingly, the "entry and disposition" procedures of the

MLA do not apply to leasing in the Petroleum Reserve. However, the NPRPA also states that

"[a]ll other provisions of law heretofore enacted [such as the MLA] ... shall remain in full force

and effect to the extent not inconsistent with this Act."[127] To clarify this delineation of statutory

authority, Congress amended the MLA to expressly specify which MLA provisions are *not*

*applicable* to the Petroleum Reserve, and 30 U.S.C. § 226-2 is *not* included in the list of

inapplicable provisions.[128] Thus, 30 U.S.C. § 226-2 applies to challenges involving Petroleum

Reserve leasing.

BLM's rulemaking under the MLA also confirms that the NPRPA did not repeal 30

U.S.C. § 226-2 as applied to the Petroleum Reserve. Specifically, 43 C.F.R. § 3000.5 repeats the

limitations period established in 30 U.S.C. § 226-2.[129] The preamble to the final rule

implementing 43 C.F.R. § 3000.5 explains that this provision was expressly promulgated under

the authority of the MLA *and* the 1980 amendments to the NPRPA.[130] This longstanding

interpretation is entitled to deference.[131] BLM's interpretation is also consistent with plain

congressional intent to expedite Petroleum Reserve leasing decisions and "accelerate judicial

---

[126] 42 U.S.C. § 6502.

[127] *Id.*

[128] *See* 30 U.S.C. § 236a ("Nothing in sections 185, 221, 223, 223a, and 226 of this title and this section shall be construed as affecting any lands within the borders of the naval petroleum reserves and naval oil-shale reserves or agreements concerning operations thereunder or in relation to the same ... ."). Section 226 is separate and distinct from Section 226-2.

[129] 43 C.F.R. § 3000.5 states: "No action contesting a decision of the Secretary involving any oil or gas lease, offer or application shall be maintained unless such action is commenced or taken within 90 days after the final decision of the Secretary relating to such matter."

[130] 48 Fed. Reg. 33,648, 33,658 (July 22, 1983) (stating that the "[a]uthority" for the provision at 43 C.F.R. § 3000.5 that places a "[l]imit on time to institute suit to contest a decision of the Secretary" includes, *inter alia*, the 1980 NPRPA amendments at "Department of the Interior Appropriations Act, Fiscal year 1981 (Pub. L. 96-514)").

[131] *Ariz. Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1254 (9th Cir. 2007) ("We should 'normally accord particular deference to an agency interpretation of "longstanding" duration.'" (quoting *Barnhart v. Walton*, 535 U.S. 212, 220 (2002))).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 21

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

97674850.3 0028116-00133

review." It would be absurd to read the NPRPA as *repealing* the application of 30 U.S.C. § 226-2 and thereby *extending* the time to file legal challenges to lease sales to the general *six-year* statute of limitations.[132]

Furthermore, the clear and brief limitations period for challenging lease sales established in the MLA is essential to a competitive leasing program in the Petroleum Reserve, under which companies seek to assemble acreage positions that allow for economic exploration of these public lands. The expeditious leasing program envisioned by Congress cannot function if lease sales can be challenged *years* after they are executed, and after the purchasers have invested millions of dollars in exploring and developing those leases.[133]

In sum, all of NRDC's challenges to the 2016 Lease Sale must be dismissed. NRDC has missed the applicable statute of limitations period by more than a year, and its claims fail as a matter of law.

## B. All of NRDC's NEPA Claims Must Be Dismissed.

### 1. NRDC's Claims Are Contrary to Ninth Circuit Precedent Affirming the Use of an Identical NEPA Framework for the NPR-A at the Leasing Stage.

The premise of NRDC's NEPA claims is that the 2012 IAP EIS was merely a "planning framework" and that BLM was required—for each annual lease sale—to prepare additional NEPA analyses in which to compare new ranges of leasing alternatives and examine the indirect effects of greenhouse gas ("GHG") emissions deriving from the consumption of oil and gas produced by future specific development projects.[134] Despite BLM's longstanding practice to the

---

[132] *See* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.").

[133] These concerns are not hypothetical. CPAI has already invested significant resources in the 2016 leases, including securing permitting and drilling an exploratory well in 2018 at West Willow. *See* http://dog.dnr.alaska.gov/Documents/Maps/ActivityMaps/NorthSlope/NS_ActivityMap_May2018.pdf (showing 2018 oil and gas activities).

[134] NRDC Br. at 2.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 22
97674850.3 0028116-00153

contrary, NRDC believes that the full NEPA analysis for the leasing program (which evaluated the impacts of leasing the *entire* Petroleum Reserve) must be repeated annually for each sale under the program to lease a *portion* of the Petroleum Reserve. In short, NRDC fundamentally disagrees with BLM's longstanding approach to the NEPA review of Petroleum Reserve leasing.

NRDC's premise is fundamentally flawed. The Ninth Circuit in *Northern Alaska Environmental Center v. Kempthorne* affirmed BLM's approach long ago.[135] In that case, the Ninth Circuit affirmed the use of a hypothetical development scenario and pragmatically observed that "until the lessees do exploratory work, the government cannot know what sites will be deemed most suitable for exploratory drilling, much less for development."[136] The Ninth Circuit explained that this hypothetical analysis "at the leasing stage" (*i.e.*, development of the regional leasing plan) satisfied NEPA, and concluded that the plaintiffs' position was an impossible "'chicken or egg' conundrum in that if plaintiffs' interpretation of its requirements were adopted, NEPA could never be satisfied in the circumstances of this case."[137]

The 2016 and 2017 Lease Sales are plainly part of the "leasing stage,"[138] and the environmental consequences of (and alternatives to) those leasing decisions were evaluated in the 2012 IAP EIS. The 2016 and 2017 Lease Sales were "part of the preferred alternative previously analyzed in the IAP/EIS,"[139] and, in fact, part of the alternative that was "strongly

---

[135] *N. Alaska Envtl. Ctr.*, 457 F.3d at 974.

[136] *Id.* at 976.

[137] *Id.* at 974, 976; *see also Native Village of Point Hope v. Jewell*, 740 F.3d 489, 493-94 (9th Cir. 2014) ("An agency is not required at the lease sale stage to analyze potential environmental effects on a site-specific level of detail.").

[138] *Andrus*, 642 F.2d at 593 ("[L]ease sale itself is only a preliminary and relatively self-contained stage within an overall oil and gas development program which requires substantive approval and review prior to implementation of each of the major stages: leasing, exploring, producing."); *N. Alaska Envtl. Ctr.*, 457 F.3d at 977 (citing and relying on *Andrus* for the proposition that "oil and gas programs ... include separate leasing, exploration, and development stages," and that hypothetical development analysis was sufficient for the leasing stage).

[139] AR 9514; AR 2904.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 23

97674850.3 0028116-00155

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

support[ed]" by NRDC.[140] Consistent with *Northern Alaska Environmental Center v. Kempthorne*, the 2013 IAP EIS's "broad-scale management decision" expressly made *11.8 million acres* "available for oil and gas leasing" and, accordingly, the 2012 IAP EIS evaluates the environmental impacts associated with leasing *all of those 11.8 million acres*.[141] As BLM stated, "[t]he impact analysis provides suitable specificity of analysis for broad scale management decisions, *such as determinations of what lands to make available for leasing*."[142] BLM further explained that it would review the IAP EIS before each lease sale to determine whether there is any new significant information not addressed by the IAP EIS that requires BLM to supplement the IAP EIS before offering leases for bid.

Once the leasing stage is complete, BLM conducts additional detailed NEPA analyses for the federal actions that authorize activities at the second (exploration) stage and the third (development) stage. Indeed, the future site-specific analyses contemplated in the 2012 IAP EIS expressly refer to permits for "on the ground" activities, such as exploration, development, and production.[143] For all leases issued under the 2013 IAP, "[a]ll surface disturbing activities such as exploratory drilling, road/pipeline construction, seismic acquisition, and overland moves require additional authorization(s) issued subsequent to leasing,"[144] and those subsequent authorizations will require NEPA analysis.[145] Again, this is fully consistent with the Ninth

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900  Fax 206.386.7500

---

[140] AR 2025.

[141] AR 2645.

[142] AR 1881 (emphasis added).

[143] AR 2645; AR 0023 (identifying specific actions that will require subsequent site-specific NEPA review).

[144] AR 9614 (Lease Stipulations and Best Management Practices).

[145] AR 3434.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 24

97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

Circuit's affirmation that a hypothetical analysis was appropriate for the "leasing stage" and that the need for additional NEPA review will arise at "the exploration and permit stages."[146]

NRDC cites *Conner v. Burford* for the proposition that BLM must nevertheless conduct detailed NEPA analyses before each lease sale "because it is the stage at which BLM commits to selling leases that in its view contain a development right."[147] However, in *Northern Alaska Environmental Center v. Kempthorne*, the Ninth Circuit explained that "*Conner* is of no assistance to plaintiffs," because *Conner* "did not discuss the degree of site specificity required in the EIS."[148] Rather, *Conner* addressed only "whether [an EIS] had to be completed at all" because BLM had issued leases *without conducting any EIS*.[149] The Ninth Circuit also found that once the leases issued, "[t]he government cannot, however, consistent with current statutory imperatives, forbid all oil and gas development," and that the "leasing program thus does constitute an irretrievable commitment of resources."[150] Therefore, "[a]n EIS is undeniably required, and, indeed one has been prepared."[151] Similarly, here, the 2013 IAP identified which parcels to make available for leasing and the 2012 IAP EIS addressed subsequent leasing

---

[146] *N. Alaska Envtl. Ctr.*, 457 F.3d at 977-78. Indeed, this is precisely what has occurred in the Petroleum Reserve. BLM prepared a detailed and comprehensive Supplemental EIS ("SEIS") analyzing the environmental impacts from development of the GMT-1 project, which went unchallenged. *See* U.S. Department of the Interior, Bureau of Land Management, SEIS, Record of Decision (Feb. 20, 2015), https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=50912. BLM has similarly prepared a Draft SEIS analyzing the environmental impacts from development of the GMT-2 project, and will finalize the SEIS before the project begins. *See* U.S. Department of the Interior, Bureau of Land Management, Draft SEIS (June 21, 2018), https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=94250.

[147] *See* NRDC Br. at 24 (citing *Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988) ("[T]he government must complete an EIS before it makes an irretrievable commitment of resources by selling non-NSO leases.")).

[148] *N. Alaska Envtl. Ctr.*, 457 F.3d at 976.

[149] *Id*.

[150] *Id*.

[151] *Id*. This EIS is precisely what is contemplated by 43 C.F.R. § 3131.2 (cited by NRDC), which requires lease sales to proceed "after completion of the required environmental analysis." *See* NRDC Br. at 19-20.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 25

97674850.3 0028116-00033

decisions, including the 2016 and 2017 Lease Sales. This is an "irretrievable commitment of resources," requiring an EIS, and BLM prepared an IAP EIS, just as it did in *Northern Alaska Environmental Center v. Kempthorne*.[152]

Furthermore, NRDC's arguments cannot be squared with its own actions. BLM transparently stated in the 2012 IAP EIS and 2013 IAP that it was "authoriz[ing] multiple lease sales," and that it would not prepare another EIS prior to those sales unless the supplementation standard was met.[153] NRDC fully commented on the Draft IAP EIS and raised the objections it now makes again, and all of its comments were addressed by BLM at that time.[154] Rather than challenging the 2012 IAP EIS, NRDC let five annual lease sales be held (all based on the 2012 IAP EIS) before filing this case. Not only were the lease sales held, but exploration wells were drilled and additional leases were purchased at subsequent sales, all in reliance on a leasing program that reasonably appeared to be final (and unchallenged). NRDC's newfound position is thus at odds with both its own actions and the careful, structured process for NEPA review in the Petroleum Reserve that has been used for over a decade by BLM, expressly affirmed by the Ninth Circuit, and relied upon for investment decisions.

For these reasons, NRDC's NEPA claims should be dismissed because they are premised on the incorrect notion that BLM was required to conduct (and essentially repeat) a new EIS for each lease sale. This premise cannot be squared with BLM's past practice, or the Ninth Circuit's endorsement of that past practice in *Northern Alaska Environmental Center v. Kempthorne,* or

---

[152] NRDC's reference to the "non-NSO" lease reference in *Conner* is misplaced. In *Northern Alaska Environmental Center v. Kempthorne*, the Ninth Circuit already decided that NPR-A leases are more like "non-NSO" leases, meaning an EIS has to be prepared for those lease sales, *and* that an EIS that projected hypothetical development scenarios on those leases (exactly as prepared here) was sufficient at the "leasing stage." 457 F.3d at 977.

[153] AR 0023.

[154] The 2012 IAP EIS also evaluates, in detail, all of the potential effects described by NRDC in its brief. *See* NRDC Br. at 9-11.

any legal requirement under NEPA.[155] Indeed, it is well-settled that BLM "is not required to repeat its analysis simply because the agency makes subsequent discretionary choices in implementing the program."[156]

### 2. NRDC's Claims Challenging the Adequacy of the 2012 IAP EIS Are Barred by NPRPA's Statute of Limitations.

If NRDC disagreed with BLM's NEPA approach to leasing in the Petroleum Reserve, it was required to challenge the 2012 IAP EIS within the limitations period applicable to challenges to the adequacy of Petroleum Reserve NEPA documents. NRDC failed to do so and, as set forth below, its claims challenging the adequacy of the 2012 IAP EIS are precluded by the NPRPA's statute of limitations.

The NPRPA places a strict limitations period on any challenge to the adequacy of an EIS:

> Any action seeking judicial review of the adequacy of any program or site-specific environmental impact statement under section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) concerning oil and gas leasing in the National Petroleum Reserve—Alaska shall be barred unless brought in the appropriate District Court within 60 days after notice of the availability of such statement is published in the Federal Register.[157]

The "notice of availability" for the 2012 IAP EIS was published in the Federal Register on December 28, 2012.[158] Any action challenging the adequacy of the 2012 IAP EIS therefore had to be filed by February 26, 2013.

NRDC's claims squarely challenge the adequacy of the 2012 IAP EIS. NRDC first argues that BLM was required to analyze the climate impacts of future combustion from oil and gas extracted from future development of the Petroleum Reserve prior to issuing the 2016 and 2017

---

[155] NRDC does not even cite *Northern Environmental Law Center v. Kempthorne* in its summary judgment brief.

[156] *Mayo*, 875 F.3d at 21.

[157] 42 U.S.C. § 6506a(n)(1); *see also* 43 C.F.R. § 3130.0-2 (stating the same limitations period).

[158] 77 Fed. Reg. 76,515 (Dec. 28, 2012).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 27
97674850.3 0028116-00033

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900 Fax 206.386.7500

Lease Sales. NRDC complains that the 2012 IAP EIS "does not assess the effects of consuming the oil and gas produced from the program areas."[159] NRDC asserts that the analysis relied upon by BLM—originally in the 2012 IAP EIS—is "legally inadequate" and goes on to complain at length about various alleged climate-related deficiencies in the 2012 IAP EIS.[160] In its second claim, NRDC challenges the scope of the alternatives considered by BLM in the 2012 IAP EIS. NRDC argues that "[t]he Plan EIS did not make decisions about which areas to lease in specific lease sales or weigh different leasing alternatives" and that "none of the Plan EIS alternatives provided a comparison of the environmental impacts of different lease sale configurations" and, therefore, "do not satisfy NEPA."[161] Accordingly, both of NRDC's claims take issue with the adequacy of certain elements of the 2012 IAP EIS (its evaluation of climate-related impacts and its range of alternatives) and, consequently, challenge "the adequacy of any program or site-specific environmental impact statement under" NEPA. These claims are subject to 42 U.S.C. § 6506a(n)(1)'s limitations period.

Tellingly, NRDC raised these same objections to the adequacy of the 2012 IAP EIS when it commented on the Draft IAP EIS over six years ago. In those comments, NRDC asserted that the Draft 2012 IAP EIS "fails to adequately disclose, analyze, and mitigate ... [t]he greenhouse gas emissions from the exploration, development, production, transportation, and combustion of the oil and gas ultimately produced as a result of the lease sales under each alternative."[162] NRDC's comments go on for over 11 full pages addressing, in detail, NRDC's position on climate change, the alleged inadequacies of the Draft IAP EIS with respect to climate change,

---

[159] NRDC Br. at 22.

[160] *See, e.g.*, NRDC Br. at 21-22.

[161] NRDC Br. at 29.

[162] AR 1931; AR 1933 (BLM "does not consider the greenhouse gases that will be produced by the burning of the oil and gas extracted from lands on the NPR-A (i.e., the lifecycle of the oil and gas), or from the release of methane from melting permafrost on the seafloor.").

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 28

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900 Fax 206.386.7500

97674850.3 0028116-00133

and NRDC's conclusion that the IAP EIS must include the same detailed assessment of indirect climate change effects that NRDC now contends BLM must prepare.[163] In response, BLM provided a well-reasoned explanation for its decision not to include, at the leasing stage, a detailed assessment of the indirect consumption effects of oil and gas potentially produced from Petroleum Reserve development, concluding that "the ultimate consumption of the oil and gas produced from [the] NPR-A would be a highly speculative exercise unnecessary for the land management decisions for which BLM is responsible."[164] Six years later, NRDC still claims BLM's rationale is "legally inadequate."[165]

With respect to alternatives, plaintiffs Center for Biological Diversity ("CBD") and Friends of the Earth devote an entire section of their comment letter on the Draft 2012 IAP EIS to their objection that "BLM did not consider a reasonable range of alternatives and mitigation measures to reduce impacts on the environment."[166] Other environmental groups, including plaintiff NRDC, also complained that BLM did not consider a "full range of reasonable alternatives" that includes "management prescriptions."[167] In response, BLM explained, *inter alia*, that "[t]he alternatives considered in the IAP/EIS include the full range consistent with law and regulation" and BLM "considered in this plan a full range of reasonable alternatives with respect to lands with wilderness characteristics, including alternatives that would protect wilderness characteristics in a substantial portion of the lands that contain them."[168] Later, when BLM provided notice of the 2016 Lease Sale, plaintiffs CBD and Friends of the Earth simply

[163] AR 1933-1944.
[164] *See* AR 1959-1960.
[165] NRDC Br. at 21.
[166] *See* AR 1948-1949.
[167] AR 2036.
[168] *See* AR 1964-1965, 2049.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 29

copied and pasted their range-of-alternatives objections to the Draft 2012 IAP EIS into their comment letter responding to the 2016 Lease Sale notice.[169]

Accordingly, the same issues presented by NRDC in this litigation were raised by NRDC in 2012 and responded to by BLM, and the 2012 IAP EIS was finalized *without* the analyses and additional alternatives demanded then and now by NRDC. Moreover, NRDC was fully on notice that BLM intended for the 2012 IAP EIS to serve as the NEPA review document for each of the annual lease sales to be conducted under the 2013 IAP because the 2012 IAP EIS stated that the 2013 IAP will "authorize multiple lease sales" and that "all lands that the record of decision determines to be available for leasing would be offered in the first and subsequent lease sales."[170] The 2012 IAP EIS explained that BLM would *not* conduct additional NEPA analysis prior to the first sale or each subsequent sale, so long as BLM continued to find the "existing analysis to be adequate."[171] Short of an inadequacy finding, BLM was very clear that it would not prepare more specific environmental analyses until "BLM receives an application to approve an action on the ground."[172] Since 2012, NRDC has known that the 2012 IAP EIS would provide the required NEPA review for the 2016 and 2017 Lease Sales, and NRDC cannot credibly argue otherwise given the transparency of the 2012 IAP EIS.

---

[169] *Compare* AR 2779-2781 *with* AR 1948-1949. NRDC's comments in response to the notices for the 2016 and 2017 Lease Sales do not contain any more specific objections to the range of alternatives considered by BLM. Therefore, to the extent NRDC argues that its range-of-alternatives claim is different than the objections stated in its comments, it has forfeited the claim. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004) ("Because respondents did not raise these particular objections" they have "therefore forfeited any objection to the [environmental assessment] on the ground that it failed adequately to discuss potential alternatives to the proposed action."). The comments cited on page 30 of NRDC's brief are not objections to the range of alternatives considered by BLM. *See* NRDC Br., Ex. 2 at 4, Ex. 1 at 7, Ex. 21 at 3.

[170] AR 0023.

[171] *Id.*

[172] AR 2645; AR 1881.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 30
97674850.3 0028116-00153

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

Nor is there any credible argument that the 2016 and 2017 Lease Sales somehow reopened the opportunity to challenge the adequacy of the 2012 IAP EIS.[173] Congress was clear that the statute of limitations period is triggered by the date that the "notice of the availability of such statement is published in the Federal Register," and that period has indisputably expired.[174] In addition, while BLM did make a determination of NEPA "adequacy" for the 2016 and 2017 Lease Sales, those determinations are limited by regulation to considering whether there are "new circumstances, new information or changes in the action or its impacts ... [that] may result in *significantly different* environmental effects."[175] A DNA does not reopen the original NEPA analysis itself or supplement an existing NEPA document; it simply documents and reviews new information and new circumstances to see if additional NEPA analysis is needed.[176] In short, there is no legal or equitable basis now to reopen the fundamental decisions made in the 2012 IAP EIS.

Likewise, NRDC cannot avoid the statute of limitations by characterizing its case as a challenge to the adequacy of BLM's DNA Worksheets. That is so "because a DNA is 'not [a] new NEPA analys[is],'" and "the fate of any action justified by a DNA 'must rise or fall on the contents of the previously issued NEPA documents.'"[177] Accordingly, NRDC's present NEPA claims are (and can only be) a challenge to the adequacy of the 2012 IAP EIS, and those claims are time-barred. Instead of timely challenging the 2012 IAP EIS within 60 days, NRDC waited *over five years* to file a lawsuit, allowing the 2012 IAP EIS, the 2013 IAP, and numerous lease

---

[173] *See Sierra Club v. Slater*, 120 F.3d 623, 630 (6th Cir. 1997) (rejecting argument that final decision on EIS "somehow became un-final by virtue of the fact that it was later necessary to evaluate the necessity for a supplemental EIS").

[174] 42 U.S.C. § 6506a(n)(1).

[175] 43 C.F.R. § 46.120(c) (emphasis added).

[176] *Id.*

[177] *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 57 (D.D.C. 2017) (brackets in original) (quoting *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1264 (D. Utah 2006)).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 31

sales to proceed unchallenged while companies invested millions of dollars in reliance on the 2013 IAP. NRDC's gamesmanship is precisely what Congress intended to deter when it amended the NPRPA to "assure minimum delays" and require "accelerated judicial review" of NEPA decisions to promote leasing and development in the Petroleum Reserve.[178] NRDC's challenges to the adequacy of the 2012 IAP EIS are time-barred under 42 U.S.C. § 6506a(n)(1), and must be dismissed.

### 3. To the Extent Any of NRDC's Arguments Do Not Challenge the Adequacy of the 2012 IAP EIS, They Must Also Be Dismissed.

All of NRDC's claims ultimately boil down to NRDC's disagreement with the structure and content of the 2012 IAP EIS and, as explained above, should be dismissed in whole because they are contrary to Ninth Circuit precedent and they are time-barred. However, to the extent that the Court interprets any of NRDC's claims as not challenging the adequacy of the 2012 IAP EIS, those claims can only succeed if NRDC demonstrates that the deferential NEPA standard for supplementation of an EIS is met under 40 C.F.R. § 1502.9(c) and 43 C.F.R. § 46.120(c). NRDC does not even refer to this standard, much less demonstrate that it is satisfied.

BLM is only required to supplement an EIS if "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[179] This "'new information'" must present "a *seriously* different picture of the environmental landscape."[180] Similarly, the "new circumstances, new information or changes in the action or its impacts" require supplementation only if they

---

[178] S. Rep. No. 96-985, at 34.

[179] 40 C.F.R. § 1502.9(c)(1).

[180] *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (internal quotation marks and citation omitted) (explaining that a supplemental impact statement is "'only required where new information "provides a *seriously* different picture of the environmental landscape"'").

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 32

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

97674850.3 0028116-00133

demonstrate "*significantly different* environmental effects."[181] A core purpose of a DNA is to document whether or not a supplemental EIS is required.[182]

The court's "role in reviewing an agency's decision not to prepare [or supplement] an EIS is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored."[183] As this Court has explained, "[w]hether an SEIS is required is a classic example of a factual dispute the resolution of which implicates substantial agency expertise."[184] Courts must affirm an agency decision "not to supplement" an EIS under NEPA so long as that decision "was not 'arbitrary or capricious.'"[185] The decision whether to supplement an EIS "requires a high level of technical expertise," and courts "must defer to the informed discretion of the responsible federal agencies."[186] In deciding whether an agency decision not to supplement is arbitrary or capricious, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"[187] This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one."[188]

---

[181] 43 C.F.R. § 46.120(c) (emphasis added).

[182] NEPA Handbook § 5.1 ("You may also use the DNA to evaluate new circumstances or information prior to issuance of a decision to determine whether you need to prepare a new or supplemental analysis[.]"); AR 9725 (DNA Worksheet asking whether the EIS remains "valid in light of any new information or circumstances"); *Friends of Animals*, 232 F. Supp. 3d at 62 (relying on discussion in DNA to reject argument that BLM should have supplemented EIS).

[183] *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (internal quotation marks and citation omitted).

[184] *Kunaknana,* 23 F. Supp. 3d at 1089 (internal quotation marks and citation omitted).

[185] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).

[186] *Id*. (internal quotation marks and citation omitted); *see also Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential.").

[187] *Marsh*, 490 U.S. at 378 (citation omitted).

[188] *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 33

Here, BLM appropriately conducted that review, documented its review in DNA Worksheets, and reasonably concluded that supplementation is not required. Again, NRDC does not cite to the supplementation standard or identify any new information that demonstrates "significantly different environmental effects." As explained below, both of NRDC's claims therefore should be dismissed for failure to demonstrate the supplementation standard, to the extent they are not already time-barred.

      **a.      NRDC fails to show why BLM was required to supplement the 2012 IAP EIS to include the same climate change analysis NRDC demanded of BLM in 2012.**

As to its climate change claim, NRDC has produced no new information demonstrating "significantly different environmental effects" requiring supplementation of the 2012 IAP EIS. In fact, NRDC admits that the 2012 IAP EIS already "contains the information necessary to estimate the amount of greenhouse gas pollution that may result from leasing different areas in the Reserve."[189] Additionally, NRDC already documented all of the climate change information and analyses, including the method it believes BLM is required to use to translate indirect climate effects into economic information, in its comments on the 2012 IAP EIS.[190] The only information cited in NRDC's climate change argument that could be characterized as "new" (even though NRDC does not cite it as a basis for supplementation) is the 2017 USGS assessment.[191]

However, BLM carefully considered the 2017 USGS assessment in its Revised DNA Worksheet for the 2017 Lease Sale and reasonably concluded that it did not change the NEPA

---

[189] NRDC Br. at 20; *id.* at 23 ("The Plan EIS itself contains the oil and gas potential estimates necessary to project the greenhouse gas emissions from the lease sales.").
[190] *See* AR 1933-1944.
[191] *See* NRDC Br. at 22 n.2 (citing 2017 USGS assessment).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 34
97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

analysis and that BLM's reliance on the prior 2011 USGS economic analysis remained sound.[192]

Principally, BLM explained that the 2017 USGS assessment and the 2011 USGS economic analysis estimated different variables, and were "much like comparing apples and oranges."[193] One estimates what is "technically recoverable" and the other what is "economically recoverable."[194] BLM reasonably determined that the 2011 USGS economic analysis (which considered the real-world cost of development) was more instructive, and the fact that more oil may be technically recoverable (but economically unfeasible) did not give BLM a reason to alter the "hypothetical reasonably foreseeable development scenario" utilized in the 2012 IAP EIS.[195] The Court "must defer to the [BLM's] finding that a supplemental [EIS] was not required," particularly because NRDC does not explain why the 2017 USGS assessment required BLM to supplement the 2012 IAP EIS.[196]

NRDC demands that BLM perform the same climate change analysis it demanded from BLM in 2012 when it prepared the Draft IAP EIS. BLM explained in detail why it disagreed with NRDC when it issued the final 2012 IAP EIS. For each of the 2016 and 2017 Lease Sales, BLM reviewed the 2012 IAP EIS and determined that there is "no new information or circumstances that would substantially change the analysis for the proposed lease sale," or require a supplemental EIS updating its climate change analysis.[197] Furthermore, in the 2016 DNA, BLM affirmed its decision not to conduct a quantitative assessment of the GHG emissions, explaining that "the NPR-A is considered an exploratory basin" and "as such there is not sufficient data to estimate potential production for any wells that might be drilled on the

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900 Fax 206.386.7500

---

[192] AR 9726.
[193] *Id.*
[194] *Id.*
[195] *Id*.
[196] *Tri-Valley CAREs*, 671 F.3d at 1130.
[197] AR 2905; AR 9725-9729.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 35

97674850.3 0028116-00133

leases being offered for sale."[198] NRDC may disagree with BLM's conclusions, but it offers no new information to support its longstanding climate change objections or otherwise attempt to show that BLM was required to supplement the 2012 IAP EIS. NRDC was required to either (1) timely challenge BLM's approach to climate change in the 2012 IAP EIS or (2) demonstrate why, in 2016 or 2017, new information required BLM to supplement the 2012 IAP EIS to include the analysis demanded by NRDC. Having done neither, NRDC fails to demonstrate a NEPA violation and its climate change claim should be dismissed.

Finally, in support of its climate change argument, NRDC cites to some court opinions issued after 2012.[199] To the extent NRDC implies that the law has changed since 2012 and that such a change in law is "new information" requiring BLM to supplement the 2012 IAP EIS, NRDC has again failed to support its position by not citing to a single case for the proposition that new law, or a change in law, is "new information" requiring an agency to supplement an EIS. Indeed, the law is to the contrary.[200] The supplementation standard requires a finding of "significantly different environmental effects," not a change in the law.[201] In any event, the cases cited by NRDC are inapposite. Those cases involved federal approvals of specific activities or

---

[198] AR 2906.

[199] *See* NRDC Br. at 17-18 (citing *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1373 (D.C. Cir. 2017); *WildEarth Guardians v. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233-34 (10th Cir. 2017); *Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1094-99 (D. Mont. 2017); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1196-98 (D. Colo. 2014)).

[200] *See Nat'l Indian Youth Council v. Watt*, 664 F.2d 220, 225 (10th Cir. 1981) ("We agree with the First Circuit that 'a new statute or regulation clearly does not constitute a change in the proposed action or any "information" in the relevant sense.'" (quoting *Concerned Citizens v. Sec'y of Transp.*, 641 F.2d 1, 6 (1st Cir. 1981))).

[201] *See WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77, 90-91 (D.D.C. 2012) (EPA's promulgation of new air quality standard after final EIS was published "does not reflect the sort of 'new circumstances or information' triggering an agency's duty to supplement" (citing *Marsh*, 490 U.S. at 373 ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."))).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 36

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900 Fax 206.386.7500

97674850.3 0028116-00153

projects for which estimated indirect emissions could be readily and accurately calculated.[202]

Here, in contrast, BLM reasonably determined that the speculative nature of the Petroleum

Reserve regulatory framework makes it impossible to forecast future indirect emissions with any

accuracy at the leasing stage.[203] BLM revisited this issue in the 2016 DNA and again concluded

that the "data remains unavailable about the development potential of the NPR-A," which

remains "an exploratory basin."[204] NRDC made no demonstration that BLM's explanations and

conclusions on this issue—which were provided in response to NRDC's comments six years

ago—were arbitrary.[205]

> **b.**      **BLM was not required to supplement the 2012 IAP EIS with a new NEPA analysis containing a new range of alternatives.**

The principal thrust of NRDC's alternatives argument is that NEPA requires a new EIS

prior to the issuance of any leases, and that BLM could not simply rely on the "programmatic

---

[202] *See Sierra Club*, 867 F.3d at 1363-64 (agency approval of construction and operation of three interstate natural gas pipelines in southeastern United States); *WildEarth Guardians*, 870 F.3d at 1227-28 (approval of coal lease modifications to specifically extend the life of two *existing* coal mines that together accounted for approximately 19.7% of U.S. annual domestic coal production); *Mont. Envtl. Info. Ctr.*, 274 F. Supp. 3d at 1082-83 (approval of a mining plan modification for *existing* coal mine located in the Bull Mountains of Central Montana); *High Country Conservation Advocates*, 52 F. Supp. 3d at 1184-85 (agency approvals of "on-the-ground" exploration activities, lease modification for the West Elk mine, and exploration plan to construct roads and drill pads). *Center for Biological Diversity v. National Highway Traffic Safety Administration* is similarly off-point and distinguishable on many grounds, including the facts that no EIS was prepared by the agency, the agency action involved rulemaking for which a cost-benefit assessment was required, and the case addressed the *direct* effects associated with regulations for fuel economy standards applicable to vehicle emissions. 538 F.3d 1172 (9th Cir. 2008); *see also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 548-50 (8th Cir. 2003) (cited by NRDC; approval of specific pipeline project for which court held that indirect effects of increased air emissions regulated under Clean Air Act must be evaluated).

[203] *See* AR1959-1960 ("the ultimate consumption of the oil and gas produced from [the] NPR-A would be a highly speculative exercise unnecessary for the land management decisions for which BLM is responsible").

[204] AR 2906.

[205] The regulations cited by NRDC do not impose any obligation on BLM to conduct a quantitative assessment of indirect emissions related to the issuance of Petroleum Reserve leases. *See* NRDC Br. at 19-20 (citing 43 C.F.R. § 3131.2(b), 43 C.F.R. § 2361.1(a), 40 C.F.R. § 1502.1, and 40 C.F.R. § 1500.1).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main 206.624.0900    Fax 206.386.7500

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 37

97674850.3 0028116-00153

nature" of the 2012 IAP EIS.[206] NRDC believes BLM's range of five alternatives in the 2012 IAP EIS is insufficient for the issuance of leases, and demands that BLM identify and evaluate a new range of alternatives with different lease sale "configurations" on top of the alternatives that were already analyzed in detail in the 2012 IAP EIS.[207] NRDC's position is necessarily that BLM must prepare a new EIS, with new alternatives, before *each and every annual lease sale* is conducted under the 2012 IAP EIS. There are many fatal flaws in this argument.

Initially, NRDC's argument makes no practical or pragmatic sense. The "key" issue decided in the 2013 IAP, and evaluated in the 2012 IAP EIS, was which lands to make "available for oil and gas leasing."[208] The 2012 IAP EIS fully evaluated the expected environmental impacts of making 11.8 million acres available for leasing using a hypothetical development scenario.[209] Under NRDC's theory, BLM, having just completed a 2,000-plus-page EIS in December 2012 on the decision to make 11.8 million acres of land "available for oil and gas leasing," should have *immediately* turned around and completed *another* EIS in 2013 that contained a new full range of alternatives on top of the alternatives it already evaluated (and then should have repeated that same time-consuming NEPA process analysis every year thereafter for each annual lease sale). This, according to NRDC, would allow BLM to decide which of the already *available* lands should be made *available* in a lease sale. However, the law is clear that BLM is "not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action," or to needlessly "repeat" that exercise over and over

---

[206] NRDC Br. at 25.

[207] *Id*. at 12, 25.

[208] AR 0006, 0007.

[209] *See supra* Section II.C.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 38

97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main 206.624.0900   Fax 206.386.7500

again for each annual lease sale.[210] Indeed, as affirmed by *Northern Alaska Environmental Center v. Kempthorne*, an IAP EIS *is* the "environmental analysis" that NRDC claims is required under 43 C.F.R. § 3131.2(b).[211]

Moreover, repeating the NEPA analysis for each lease sale on an annual basis, with a new range of alternatives for each sale, would add no pragmatic value or address potential environmental impacts that were not already considered. The 2012 IAP EIS evaluated the impacts of *leasing 11.8 million acres*, and any new alternatives would necessarily address lease sale variations within that 11.8 million acres made available for leasing. It is well-settled that an "EIS need not consider an infinite range of alternatives, only reasonable or feasible ones."[212] "Nor is an agency required to undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.'"[213]

BLM already disclosed and analyzed in detail the potential environmental impacts of leasing the *entire* 11.8 million acres approved for leasing in the 2012 IAP EIS, and conservatively assumed in that analysis that "[m]ultiple lease sales would be held," that "[i]ndustry would aggressively lease and explore tracts offered," and that "[s]everal industry groups would independently explore and develop new fields."[214] NRDC's "configurations" alternative is simply a subset of the selected alternative, and BLM was under no obligation (then

---

[210] *Mayo*, 875 F.3d at 16, 21 (rejecting argument that agency needed to conduct a new NEPA analysis each year for a multi-year program).

[211] *See supra* Section IV.B.1; *Marathon Oil Co. v. United States*, 807 F.2d 759, 765 (9th Cir. 1986) ("[A]n agency's interpretation of its regulations is of controlling weight unless it is plainly erroneous or inconsistent with the regulation[s]." (internal quotation marks and citations omitted)).

[212] *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (internal quotation marks and citation omitted).

[213] *Id.* (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990)).

[214] AR 0581.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main 206.624.0900   Fax 206.386.7500

or now) to conduct a separate NEPA analysis of lease "configurations" that are "not significantly distinguishable" from the leasing scenarios analyzed in the EIS, or merely "similar to, or subsets of, alternatives which *were* considered."[215] In short, "an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative."[216] BLM considered a reasonable range of alternatives in the IAP EIS, and that is all that NEPA requires.

Nor would the identification of any new "configurations" of potential lease sales make any sense because, as highlighted by the 2017 Lease Sale (in which 10.3 million acres were offered and only 80,000 acres were bid upon), what is offered and is ultimately purchased in a Petroleum Reserve lease sale is impossible to accurately predict. Indeed, as the Supreme Court has held, "[c]ommon sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man."[217] NEPA does not require the absurd, never-ending-alternatives process suggested by NRDC, and NRDC fails to address how its novel position squares with the Petroleum Reserve NEPA review framework affirmed in *Northern Alaska Environmental Center v. Kempthorne*.[218]

In addition, NRDC has not established that any new information required BLM to prepare a supplemental EIS analyzing a new range of alternatives. NRDC states that "[n]ew information about the location of recent industry interest and discoveries, the unanticipated level

---

[215] *Friends of Endangered Species, Inc. v. Jantzen*, 596 F. Supp. 518, 526 (N.D. Cal. 1984).

[216] *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1099 (9th Cir. 2012) (internal quotation marks and citation omitted).

[217] *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) ("Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.").

[218] *See supra* Section IV.B.1.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 40

97674850.3 0028116-00133

of impacts from exploration and development in the Northeastern Reserve, and other environmental changes including climate change and declining caribou herds, oblige BLM to assess and compare alternatives that might limit impacts."[219] However, NRDC does not show how these categories of allegedly "new" information constitute "new circumstances, new information or changes in the action or its impacts" that give rise to "significantly different environmental effects" than those assessed in the 2012 IAP EIS.[220] And, in any event, BLM addressed the adequacy of the alternatives in the 2012 IAP EIS before holding the 2016 Lease Sale, explaining:

> The current proposal is part of the preferred alternative previously analyzed in the NPR-A plan. The ROD authorized multiple oil and gas lease sales for the land BLM is offering in the 2016 lease sale... . The proposed lease sale is within the same analysis area analyzed in the NPR-A IAP/EIS... . The NPR-A IAP/EIS analyzed a broad range of alternatives for the entire NPR-A planning area, including alternatives that closed various areas to leasing. Each alternative included a wide range of stipulations and BMPs to protect surface resources and address a wide variety of environmental concerns, interest, and resource values…. The existing analysis and conclusions are adequate as provided for within the 2012 NPR-A IPA/EIS and the 2013 ROD. There are no new information or circumstances that would substantially change the analysis for the proposed lease sale.[221]

BLM provided similar explanations and conclusions before executing the 2017 leases, with a particular emphasis on why information regarding the 2017 USGS assessment, recent discoveries, and the post-2012 impact evaluation of development in the Petroleum Reserve (*i.e.*, GMT-1) does not establish significantly different environmental effects requiring a supplemental NEPA analysis.[222] NRDC does not meaningfully address BLM's explanations, nor does it

---

[219] NRDC Br. at 29.

[220] 43 C.F.R. § 46.120(c).

[221] AR 2904-2905.

[222] *See* AR 9724-9729.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 41

97674850.3

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

0028116-00133

demonstrate how the information it cites triggered BLM's duty to supplement the EIS and prepare a new range of alternatives for consideration.

NRDC cites *Natural Resources Defense Council v. U.S. Forest Service* ("*NRDC v. USFS*") for the unsurprising proposition that "'changed circumstances [can] affect the factors relevant to the development and evaluation of alternatives.'"[223] However, *NRDC v. USFS* does not advance NRDC's position. In that case, the Ninth Circuit found that the EIS at issue contained a significant error in a statutorily required factual "market demand" assessment that undermined the agency's entire NEPA analysis and rendered inadequate the range of alternatives considered in the EIS.[224] NRDC has made no such showing here, nor has it identified any alternatives that BLM should have considered; instead it refers to vague, generic options that BLM "might have chosen."[225] *Sierra Club v. United States* is also of no help to NRDC because, in that case, changed circumstances arose that were not contemplated by the EIS and posed new significant impacts that rendered the EIS's range of alternatives inadequate.[226] The plaintiffs in *Sierra Club* had suggested specific alternatives to address the changed circumstances, and the court held that those should have been considered.[227] Here, NRDC identifies no changed circumstances, no effects not contemplated by the 2012 IAP EIS, and no specific alternatives to

---

[223] NRDC Br. at 26 (quoting *NRDC v. USFS*, 421 F.3d 797, 813 (9th Cir. 2005)).

[224] *NRDC v. USFS*, 421 F.3d at 808-13.

[225] NRDC Br. at 29. In its comments on the Draft IAP EIS, NRDC also identified no new alternatives that BLM should have analyzed. *See supra* note 169.

[226] *Sierra Club v. United States*, 23 F. Supp. 2d 1132, 1145 (N.D. Cal. 1998) ("[T]he 1997 floods created a situation that was not contemplated by the GMP. That document operated under the assumption that a much greater number of lodging facilities would exist in the area. The floods, however, rendered this assumption inoperative. This change in circumstances 'opened for consideration' alternatives that NPS may not have previously been able to adopt.").

[227] *Id.*

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

address whatever problem NRDC may perceive. The other cases relied upon by NRDC are inapposite and also do not support NRDC's position.[228]

In addition, NRDC's demand that BLM produce more alternatives on top of the alternatives it already developed appears to be primarily driven by NRDC's concern that BLM must have the opportunity to "minimize ecological and environmental impacts."[229] But, as BLM explained, each of the alternatives that were already evaluated in detail by BLM "included a wide range of stipulations and BMPs to protect surface resources and address a wide variety of environmental concerns, interest, and resource values."[230] For example, the 2012 IAP EIS, in Table 2-3, evaluates *70 pages* of lease stipulations, operating procedures, and best management practices that will condition leases purchased in Petroleum Reserve lease sales to minimize impacts on the environment and wildlife.[231] These measures are expressly incorporated into BLM's Record of Decision.[232] NRDC does not and cannot reconcile its lease "configurations" argument with the extraordinarily detailed consideration that BLM already gave to numerous measures that will "minimize ecological and environmental impacts."[233]

---

[228] *Western Watersheds Project v. Abbey, Friends of the Bitterroot, Inc. v. U.S. Forest Service*, and *Ayers v. Espy* did not address challenges to the *range* of alternatives considered by the agency, as NRDC does here. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1049 (9th Cir. 2013); *Friends of the Bitterroot, Inc. v. U.S. Forest Serv.*, 900 F. Supp. 1368, 1373 (D. Mont. 1994); *Ayers v. Espy*, 873 F. Supp. 455, 565-66 (D. Colo. 1994).

[229] NRDC Br. at 29.

[230] AR 2904-2905.

[231] AR 0056-0125.

[232] AR 2669-2723.

[233] *See Cross Mountain Ranch Ltd. P'ship v. Vilsack*, No. 09-cv-01902-PAB, 2012 WL 4359081, at *4 (D. Colo. Sept. 24, 2012) (rejecting plaintiff's argument that site-specific measures should have been considered as alternatives and holding that the agency was not required to isolate any possible action from the Adaptive Management Plan as potential alternatives)).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 43

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

97674850.3 0028116-00033

Ultimately, NRDC is just attempting to belatedly litigate the same objections to BLM's range of alternatives that it raised and failed to challenge in 2012 and 2013.[234] BLM explained multiple times—in its 2012 IAP EIS (responses to comments), the 2016 DNA, and the 2017 Revised DNA—why the 2012 IAP EIS is sufficient and appropriately analyzes the environmental impacts of leasing in the Petroleum Reserve over a range of five alternatives. This Court should defer to BLM's rational conclusion that the five alternatives analyzed in detail in the 2012 IAP EIS sufficiently supported the lease sales offered pursuant to the 2013 IAP and should dismiss NRDC's range-of-alternatives claim, to the extent it is not time-barred.

## C.      NRDC's Remedy Requests Are Premature.

NRDC requests the Court to vacate BLM's 2016 and 2017 Lease Sales and the leases issued pursuant to those sales.[235] Alternatively, NRDC asks the Court to enjoin all activities on the leases issued in the 2016 and 2017 Lease Sales.[236] As an initial matter, if this Court finds any merit in the claims asserted by NRDC, CPAI requests the opportunity to more fully address the appropriate remedy through a supplemental proceeding that includes the opportunity for the collection and submission of evidence, briefing, and argument.

CPAI has made a substantial investment in the Petroleum Reserve and, as relevant here, invested millions of dollars by submitting the winning high bids for leases at the 2016 and 2017 Lease Sales. Because the Court's determination of a remedy in this case (should that be necessary) could have serious and far-reaching consequences, CPAI respectfully submits that focused briefing and argument on the remedy after the merits have been decided would better inform that important determination. Moreover, as to NRDC's request for injunctive relief, unlike a preliminary injunction, which requires the plaintiff to prove *likelihood* of success on the

---

[234] *See supra* Section IV.B.2.
[235] NRDC Br. at 31.
[236] *Id*. at 32.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 44
97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main 206.624.0900    Fax 206.386.7500

merits, permanent injunction is a remedy granted *after* the court rules on the merits. Without knowing the nature of a potential adverse decision, if any, it is not possible to address the merits of an injunction with any specificity. In addition, the collection and submittal of additional evidence and witness testimony may be necessary to inform the Court's consideration of injunctive relief. Notwithstanding this request, CPAI generally addresses below the reasons why the Court should deny NRDC's request for vacatur and injunctive relief.

### 1. Vacatur Is Not the Appropriate Remedy.

Although an agency action that is held to be unlawful can be set aside under the APA,[237] vacatur is "a species of equitable relief," and "courts are not mechanically obligated to vacate agency decisions that they find invalid."[238] "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"[239] As a general matter, vacatur is not warranted here because the NEPA violations alleged by NRDC are relatively minor and curable, and vacatur would have highly disruptive consequences to a competitive leasing process that is an important part of Alaska's economy.

### a. The NEPA violations alleged by NRDC are not so serious as to warrant vacatur.

NRDC's contention that BLM's lease sales violated NEPA is based on two narrow procedural issues, both pertaining to whether BLM is required to perform additional

---

[237] 5 U.S.C. § 706(2)(A).

[238] *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("Although the district court has power to do so, *it is not required to set aside every unlawful agency action.*" (emphasis added)); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures."); *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) ("[G]uided by authorities that recognize that a reviewing court has discretion to shape an equitable remedy, we leave the challenged designations in effect.").

[239] *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 45
97674850.3 0028116-00153

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900    Fax 206.386.7500*

environmental analyses before conducting the lease sales. However, the deficiencies alleged by NRDC do not reflect the type of "fundamental flaws" that would prevent BLM from making the same or substantially similar decisions on remand.[240] Before conducting the lease sales, BLM carefully evaluated the adequacy of the existing NEPA documentation and properly relied on the comprehensive 2012 IAP EIS to support its decisions. It is hard to imagine how additional (and unnecessary) NEPA analyses, as demanded by NRDC, would materially change BLM's decisions. Even if the Court finds that additional NEPA analysis is required, the existing NEPA documentation is nonetheless sound and informative in numerous aspects. The agency and the public were already apprised of the likely consequences of the lease sales on environmental impacts.

Moreover, to the extent there is any error in BLM's NEPA analysis, the seriousness of any such error(s) can be "minimized" by the fact that "additional analysis can be completed at the site-specific level before any ground-disturbing actions take place."[241] As discussed above, a lease sale is just the first step towards exploration and development and does not itself authorize any ground-disturbing activities. Each of the subsequent exploration and development stages is subject to independent decision-making and approval by BLM and requires additional NEPA review.[242] Therefore, any NEPA violation during the lease sale stage can be mitigated by additional environmental analysis at a later time and thus is not so serious as to warrant vacatur.

---

[240] *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) ("We have also looked at whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such *fundamental flaws* in the agency's decision make it unlikely that the same rule would be adopted on remand." (emphasis added)); *see also Allied-Signal*, 988 F.2d at 151 (declining to vacate because there was "at least a serious possibility that the [agency would] be able to substantiate its decision on remand").

[241] *Pac. Rivers Council*, 942 F. Supp. 2d at 1119, 1021 (finding the error in agency's NEPA analysis was not so serious as to warrant vacatur).

[242] *N. Alaska Envtl. Center*, 457 F.3d at 977.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 46
97674850.3 0028116-00133

**b.      Vacatur would have significant disruptive consequences.**

Vacatur of the lease sales and the leases would have significant disruptive consequences not only to CPAI's investment-backed expectations but also to BLM's management of millions of acres of public land. The Ninth Circuit has made clear that in considering whether vacatur is appropriate, courts should consider economic and other practical concerns.[243] CPAI has already invested hundreds of millions of dollars in the Petroleum Reserve. For the 2016 and 2017 Lease Sales alone, CPAI purchased 72 leases for a total amount of nearly $20 million.[244]

CPAI also incurred substantial pre-sale investment in anticipation of the lease sales, including spending millions of dollars in staff time and contractor fees to collect and analyze seismic data.[245] CPAI's substantial investment in data collection and analysis provided it with a competitive advantage in identifying and bidding on the most prospective areas.[246] Vacating these leases would deprive CPAI of its competitive position because in the event of any resale of the leased areas, all of CPAI's competitors would know which parcels CPAI values the most and how much it was willing to pay for particular areas.[247] Furthermore, if the leases are invalidated, CPAI will incur additional costs from delay. In *California Communities Against Toxics*, the Ninth Circuit made clear that delaying planned projects is a disruptive consequence that must be considered in determining whether vacatur is warranted.[248]

---

[243] *Cal. Cmtys. Against Toxics*, 688 F.3d at 994 ("[I]f saving a snail warrants judicial restraint, so does saving the power supply." (citation omitted)).

[244] Schell Decl. ¶¶ 7, 8; *see supra* note 98.

[245] *Id.* ¶ 11.

[246] *Id.*

[247] *Id.*

[248] 688 F.3d at 993-94.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 47

97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

Additionally, the Court should consider the "unnecessarily harsh result" of divesting CPAI of its property rights if the leases are vacated.[249] The Petroleum Reserve is a key area of interest and investment for CPAI. Losing the leases and the exclusive rights under those leases to explore for and potentially develop and produce oil would seriously impair CPAI's long-term business plans in the area.[250]

Vacatur of the lease sales and the leases would also have disruptive impacts on BLM's management of the Petroleum Reserve. If BLM ultimately decides leasing the relevant areas is appropriate, it will need to undertake new lease sales and yet again offer the same areas for lease. This will require BLM to undertake a variety of duplicative tasks and incur additional costs, causing an unnecessary waste of "significant expenditure of public resources."[251]

Under these circumstances, the Court should deny NRDC's request to vacate the 2016 and 2017 Lease Sales, should it find any merit in NRDC's claims.

### 2. NRDC Establishes No Basis for a Permanent Injunction.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."[252] To obtain a permanent injunction, a plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[253]

---

[249] *Conner*, 848 F.2d at 1461 n.50 (clarifying district court's remedy order to *not* set aside oil and gas leases in order to avoid the unnecessarily harsh result of completely divesting the lessees of their property rights).

[250] Schell Decl. ¶¶ 3, 4.

[251] *Idaho Farm Bureau*, 58 F.3d at 1405-06 (noting expenditure of public resources constitutes equitable concern weighing against vacatur).

[252] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

[253] *Id.* at 156-57 (citation and quotation marks omitted).

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 48
97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

A permanent injunction does not automatically issue, nor is it presumptively proper, upon a finding of a NEPA violation.[254]

NRDC has not demonstrated that it will suffer irreparable harm in the absence of an injunction. "'[S]peculative injury does not constitute irreparable injury sufficient to warrant [an] … injunction.'"[255] A plaintiff seeking injunctive relief "'must do more than merely allege imminent harm sufficient to establish standing.'"[256] In particular, the plaintiff must demonstrate "'*immediate* threatened injury as a prerequisite to … injunctive relief.'"[257]

NRDC has not identified any "specific, concrete actions" as a result of the lease sales that are "needed to justify the extraordinary remedy of injunctive relief."[258] Instead, all of NRDC's claims of irreparable harm merely describe the supposed generalized effects of unspecified exploration activities and speculate about activities that "can also lead to," "can also result in," "can be expected to have," or "can have" allegedly adverse effects.[259] NRDC has not identified *a single activity* from which it will suffer harm, let alone "specific, concrete actions" that immediately threaten irreparable harm to NRDC. For this reason alone, NRDC has established no basis for permanent injunctive relief.[260]

Because NRDC identifies no "specific, concrete actions" that form the basis for its request for injunctive relief, it is impossible to meaningfully assess whether NRDC has adequate legal remedies to address any such actions, whether the balance of hardships associated with any

---

[254] *See id.* at 157.

[255] *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)).

[256] *Id.* (citation omitted).

[257] *Id.* (emphasis added; citation and emphasis omitted).

[258] *Pac. Rivers Council*, 942 F. Supp. 2d at 1025-26.

[259] NRDC Br. at 33-35.

[260] *See Pac. Rivers Council*, 942 F. Supp. 2d at 1025-26 (finding that, even in light of NEPA violation, organization's failure to identify specific project that will harm members "falls well short of the concrete injury to the plaintiff needed to justify the extraordinary remedy of injunctive relief").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

such actions tips in favor of NRDC, or whether an injunction would be in the public interest. However, it is worth noting that the relevant "public interest" is not as clear-cut as NRDC would have the Court believe. The "expedited" leasing program in the Petroleum Reserve was developed under the direct and express mandate of Congress to provide a means to meet the nation's energy needs (while also protecting surface values), and the leasing program set forth in the 2013 IAP was established in response to President Obama's explicit directive to hold annual lease sales.[261] CPAI's leasing and development in the Petroleum Reserve is fully consistent with, and advances, these important public policies.

In sum, although NRDC's opening brief does not even establish the first prerequisite for injunctive relief, CPAI expects NRDC to make a second attempt in its reply brief to identify "specific, concrete actions" that will allegedly cause immediate irreparable harm. CPAI respectfully requests that it be given a full and fair opportunity to address NRDC's request for injunctive relief, if needed, in a supplemental process that involves full briefing, the opportunity to submit written and oral testimony, the opportunity to cross-examine or depose NRDC's witnesses, and a hearing before the Court. The need for, and scope of, this process can only be determined once it is known which, *if any*, of NRDC's substantive claims are granted.

## V. CONCLUSION

For the foregoing reasons, NRDC's motion for summary judgment should be denied, and the cross-motions for summary judgment filed by the Defendant and the Intervenor-Defendant should be granted.

---

[261] *See supra* Section II.C.

CONOCOPHILLIPS' BRIEF IN OPPOSITION
3:18-cv-00031-SLG
Page 50

97674850.3 0028116-00133

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

DATED:  July 24, 2018.

STOEL RIVES LLP

By: */s/ Ryan P. Steen*
    RYAN P. STEEN
    JASON T. MORGAN
    Attorneys for ConocoPhillips Alaska, Inc.

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA  98101
*Main 206.624.0900     Fax 206.386.7500*

CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2018, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:18-cv-00031-SLG who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Ryan P. Steen
Ryan P. Steen

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500